```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TENNESSEE
 2                  AT KNOXVILLE, TENNESSEE

 3  _____)
                                    )
    MARILYN R. FOSTER,              )
 4                                  )
        Plaintiff,                  )
 5                                  )
    vs.                             )  Case No. 3:19-cv-24
 6                                  )
    JONATHAN WILLIAM HAFNER, M.D.   )
 7  and EAST TENNESSEE EAR, NOSE &  )
    THROAT SPECIALTIES, P.C.,       )
 8                                  )
        Defendants.                 )
 9  _____)

10              EXCERPT OF TRIAL PROCEEDINGS
        BEFORE THE HONORABLE CHARLES E. ATCHLEY, JR.
11
                Tuesday, March 29, 2022
12                    PM SESSION

13  APPEARANCES:

14          ON BEHALF OF THE PLAINTIFF:

15          PATRICK SHEA CALLAHAN, ESQ.
            CALLAHAN AND BINKLEY, PLC
16          321 East Spring Street
            Suite 304
17          Cookeville, TN 38501

18          JON E. JONES, ESQ.
            LAW OFFICE OF JON E. JONES
19          P.O. Box 699
            Cookeville, TN 38503-0699
20

21

22
    REPORTED BY:
23
    Teresa S. Grandchamp, RMR, CRR
24  P.O. Box 1362
    Knoxville, Tennessee 37901
25  (865) 244-0454
```

1    **APPEARANCES:** (Continued)

2            **ON BEHALF OF THE DEFENDANTS:**

3            CLARENCE J. GIDEON, JR., ESQ.
             JUSTIN BLAKE CARTER, ESQ.
4            GIDEON, ESSARY, TARDIO & CARTER, PLC
             315 Deaderick Street
5            Suite 1100
             Nashville, TN 37238

6
                    *  *  *  *  *  *  *  *
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **INDEX**

2    **WITNESS FOR THE PLAINTIFF:**                              PAGE

3    **JONATHAN WILLIAM HAFNER, M.D.**

4    Direct Examination                                           5
     By Mr. Jones
5
     Cross-Examination                                         104
6    By Mr. Gideon

7    Redirect Examination                                       137
     By Mr. Jones
8
     Recross-Examination                                        144
9    By Mr. Gideon

10

11             **EXHIBITS**

12   **FOR THE PLAINTIFF:**

13   **EXHIBIT** (DESCRIPTION)                    **ID:**    **IN EVID:**

14   **Exhibit No. 1-134**(Progress Note)          17          17
     **Exhibit No. 1-211**(Progress Note)          18          18
15   **Exhibit No. 21**(Drawing)                   78
     **Exhibit No. 23**(Drawing)                   84          85
16

17   **FOR THE DEFENDANT(S):**

18      **Exhibit No. 1**(Drawing)                107         107

19                 *  *  *  *  *  *  *  *

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  All rise.

2          This honorable court is now in session.  Please

3   come to order and be seated.

4          THE COURT:  All right.  Good afternoon.

5          MR. JONES:  Good afternoon, Judge.

6          THE COURT:  Are we ready, Mr. Jones?

7          MR. JONES:  Plaintiff is ready.

8          THE COURT:  All right.  Let's go ahead and

9   bring our jury in.

10          (Whereupon the following report of

11           proceedings was had within the presence

12           and hearing of the jury:)

13          THE COURT:  Just have a seat.

14          All right.  Welcome back.  Everyone ready?

15          Everybody is here.  All right.

16          Mr. Jones, call your first witness, please.

17          MR. JONES:  Dr. Hafner.

18          THE COURT:  All right.

19          (The witness was thereupon duly sworn.)

20          THE COURTROOM DEPUTY:  Thank you.  You may be

21   seated.

22          THE COURT:  Whenever you're ready, Mr. Jones.

23

24

25

1        **JONATHAN WILLIAM HAFNER, M.D.**,

2    having been first duly sworn, was examined and testified

3    as follows:

4                        DIRECT EXAMINATION

5    BY MR. JONES:

6    Q.        Dr. Hafner, the jury has heard about some of

7    your background and education.  Tell the jury how long

8    you have practiced medicine in Tennessee.

9    A.        Well, I did my medical school at the University

10   of Tennessee, but I started practicing in Tennessee as a

11   physician, as an ear, nose and throat physician, in

12   2016.

13   Q.        Okay.  And how many partners do you have in

14   that practice?  I'm using "partners."  How many

15   associates do you have?

16   A.        I have three other partners in my practice.

17   Q.        In the course of your practice, what is most of

18   your work?  What do you do mostly?

19   A.        I'm a general otolaryngologist.  So that means

20   we do some of everything.  We do tubes and tonsils.  We

21   do head/neck cancer surgeries.  We do ear surgeries,

22   fixing holes in the eardrum.  So we're called general

23   otolaryngologists, and so we kind of do a little bit of

24   everything.

25   Q.        What's the majority of your practice?

1  A.      Again, you know, tubes, tonsils, thyroid

2  surgeries, head/neck cancers, some skin cancers, some

3  ear surgeries.  I don't have a particular focus in my

4  practice.

5  Q.      Would 50 percent or so of your practice be made

6  up of tonsil issues, tubes in the ears and those things?

7  A.      By number, tonsils and tubes end up being a

8  large number of our procedures.

9  Q.      All right, sir.  How many Zenker's diverticulum

10 surgeries have you done?

11 A.      I had done three and four in practice when I

12 was in Texas; approximately about eight of them in

13 training.

14 Q.      Okay.  In training in your residency, did you

15 do those all by yourself or did you have anybody else

16 with you?

17 A.      No, in training, you're there with faculty.

18 Q.      Now, so would you do part of those surgeries,

19 all of those surgeries, or I guess it depended on where

20 you were in residency?

21 A.      Correct.

22 Q.      Have you done -- have you done any Zenker's

23 diverticulum surgeries since Mrs. Foster's?

24 A.      I have not.

25 Q.      Have you done any research about this surgery

1  since you did Mrs. Foster's surgery?

2  A.      Yes.

3  Q.      Let's start then with the issue of size.  Have

4  you ever operated on a Zenker's of two centimeters or

5  less endoscopically other than in this case?

6  A.      I don't recall the specific sizes in training.

7  I believe all the ones I did in Texas were larger than

8  two centimeters.

9  Q.      Do you have any impression that any -- that any

10  Zenker's you ever took part in was under two

11  centimeters?

12  A.      I can't recall from residency.

13  Q.      Does the size of a Zenker's change surgical

14  techniques, surgical approach?

15  A.      Sometimes it does.

16  Q.      And there are vari- -- there are various ways

17  to do Zenker's, aren't there?

18  A.      Traditionally, Zenker's diverticulums are done

19  with an open approach through the neck.  Within the last

20  20 years, approximately, the majority of the approaches

21  are what we call endoscopically, which means we're going

22  through the mouth, going down to the area of that sac,

23  and there is multiple techniques that people have

24  described.  The primary ones being using a laser to

25  divide that septum between that sac, stapling, and then

1    the HARMONIC® scalpel are probably the three most common

2    methods.

3    Q.        Let's talk about laser for a minute just to get

4    a little bit more background.

5              The $CO_2$ laser is done with a microscope, and

6    you can actually see on a cell-by-cell basis what you

7    are dividing; is that correct?

8    A.        You can't see the cells.  Cells are much

9    smaller than you can see with a microscope.  So I

10   don't --

11   Q.        So if there is testimony from people that do

12   that in the record, that they can tell on a cellular

13   basis that they're in muscle tissue, do you disagree

14   with that?

15   A.        Well, you can see muscle, but a cell is smaller

16   than we can see with an operating microscope.

17   Q.        Okay.  Is it more precise than the surgery you

18   do, as far as differentiating and disclosing exactly the

19   kind of tissue that you're cutting?

20   A.        I don't know that it is necessarily more

21   precise.

22   Q.        How would you -- how would you characterize it?

23   A.        It's just a different technique to divide that

24   tissue.

25   Q.        And have you read the testimony of a doctor at

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  Vanderbilt, deposition testimony, who does this surgery

2  microscopically, about -- about her ability when she

3  does this surgery with the microscope to tell on a

4  cellular level?

5  A.        Yes, I've read Dr. Vinson's notes and

6  Dr. Francis' notes saying they use the $CO_2$ laser to do

7  this procedure.

8  Q.        And do you recall seeing her testimony that she

9  can use this precise method and precisely see and divide

10  and know she is in the muscle tissue that way with her

11  microscope?

12  A.        Correct.

13  Q.        Okay.  Now, let's start a little backwards on

14  this.  I want to ask you some questions about the second

15  surgery, the repair surgery, and try to get an

16  understanding of what you're describing in the operative

17  note.

18  A.        Sure.

19  Q.        You went back about midnight to do the surgery

20  because your patient in the previous surgery had

21  developed, at at least some point after this, signs and

22  symptoms of a perforation; is that correct?

23  A.        Correct.

24  Q.        And you were told by a nurse that when she was

25  brought to the room after your surgery the first day and

1    when -- after she got out of the postanesthesia care

2    that she started having neck swelling at that time; is

3    that correct?

4    A.       That is incorrect.  The first time I was

5    notified that she had any swelling of the neck was the

6    day following the surgery in the afternoon.

7    Q.       All right.  When did the nurse tell you she

8    first had signs of neck swelling?  I'm not saying when

9    did the conversation you had with the nurse take place.

10   When was the nurse saying there was swelling?

11   A.       Well, the first time I had any information

12   about neck swelling was the afternoon on the day after

13   the surgery.

14   Q.       Okay.  Forgive me for being clumsy in my

15   questions.

16            I'm not trying to -- I'm not asking you now

17   when you were first told about it or told that there

18   were signs, but did a nurse tell you that she had

19   swelling in the neck when she came up, was brought to

20   the room following surgery, and that it had gotten worse

21   over time?

22   A.       No, a nurse did not tell me that.

23            MR. JONES:  000134.

24   BY MR. JONES:

25   Q.       Okay.  Doctor, do you see that on your screen?

**DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.**

1    A.        I do not have anything on the screen yet.

2              THE COURTROOM DEPUTY:  It's on.

3              MR. JONES:  I'll try to do it the old-fashioned

4    way.

5              MR. CALLAHAN:  Hold on, Jon.

6              THE COURTROOM DEPUTY:  One second.  There you

7    go.

8    BY MR. JONES:

9    Q.        Doctor, I'll give you a chance to look at that,

10   but is that your note?

11   A.        Yes, it has my signature at the bottom.

12   Q.        Do you believe this note to be accurate?

13   A.        I wrote the note, so, yes, it is accurate.

14   Q.        I'm sorry?

15   A.        Yes, I wrote the note.  It's accurate.

16   Q.        Okay.  Now, this is called an ENT Progress

17   Note.  It's part of the Methodist Medical Center record.

18   It said, "Called nurse this morning, this a.m."  You're

19   making this note on the afternoon of -- almost 6:53 p.m.

20   on the 13th, which is the day after your first surgery;

21   is that right?

22   A.        Day after surgery, correct.

23   Q.        "Called nurse this morning."  And what's this

24   symbol after that?  You've got a triangle?

25   A.        This a.m.

1   Q.      And, "Patient suctioning and not swallowing."

2   Was this the first time you had any contact about this

3   patient since you had done your surgery?

4   A.      In the morning, yes.

5   Q.      Okay.  And what time that morning was this?

6   A.      I don't recall.  Approximately probably

7   9:00 a.m.

8   Q.      All right.  And after this call, when did you

9   next have any contact about this patient?

10  A.      It was in the afternoon.  It was -- you know, I

11  think I have there in the note that I was called

12  approximately 3:30 p.m.

13  Q.      All right.  And you called back at 3:30 p.m.

14  about that today, and patient reported by nurse to have

15  neck swelling since when?

16  A.      Since coming to the floor last night.

17  Q.      Okay.

18  A.      But that's the first time I learned of that.

19  Q.      I understand you first learned about it in the

20  afternoon.

21  A.      Right.

22  Q.      My question is, though:  We're talking about

23  when this patient first had signs that she already was

24  having a neck -- and had already been experiencing a

25  neck perforation.  Is swelling in the neck where you've

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1    done your surgery concerning for a possible perforation

2    on the part of the doctor that has done the surgery?

3    A.      Yes, it is.

4    Q.      So earlier, just a moment ago when I asked you

5    if you had ever had any report that this patient when

6    she came to the room was having neck swelling, was your

7    memory wrong about that?

8    A.      The day of surgery, I did not have any

9    information.  I learned about it the day after surgery,

10   and that's documented in my note.

11   Q.      Okay.  And forgive me for being so clumsy in

12   those four questions not to differentiate that now, but

13   you've known all the time that she had signs of a neck

14   perforation by the time she reached the floor, by the

15   time she reached her room following your surgery; is

16   that correct?

17   A.      The information I'm trying to convey is that I

18   learned about that the day after surgery, not the day of

19   surgery.

20   Q.      Okay.

21   A.      But, yes, since that time, yes, I was aware a

22   day after surgery that she had developed that the day

23   before.  I was just not notified of that until the day

24   afterwards.

25   Q.      So within an hour or so or at least a couple

1   hours from the time you did your probe in her -- in her

2   throat to see if you could find if there was any hole at

3   that time, within a few hours of that, she plainly had a

4   hole where you had done this surgery, to the best of

5   your knowledge; is that correct?

6   A.       It's whenever the nurse would have reported

7   that she had swelling in her neck.

8   Q.       Well, the nurse is reporting that she had

9   swelling in her neck when she arrived at the room,

10   basically; isn't that correct?

11   A.       Correct, but I don't know what time that was.

12   Q.       Okay. So you had known that she had been

13   experiencing swelling in the neck for 24 hours or so

14   before you were seeing the patient at about 3:30 that

15   afternoon; is that correct? Sometime after 3:30?

16   A.       Again, the way you're saying that, I learned of

17   that during the second call at 3:30. So I didn't know

18   about air being in the neck.

19         Retrospectively, I can say that from what the

20   nurse documented that there was air there, but I did not

21   know about that until the following day.

22   Q.       Okay. All right. And your plan in the second

23   surgery -- you got some additional MRI studies and

24   imaging studies after you wrote this note; is that

25   correct?

1  A.      There were CT scans or CAT scans, not an MRI,

2  but --

3  Q.      Okay.  But your plan was to go in and drain the

4  mediastinal fluid or infection out of the neck; is that

5  correct?  That's part of the plan?

6  A.      That is part of the plan, correct.

7  Q.      And the second part of the plan was to remove

8  the diverticulum; is that correct?

9  A.      That's correct.

10  Q.      And you expected to complete the myotomy; is

11  that correct?

12  A.      That is correct.

13  Q.      In other words, the CP muscle that you had not

14  gotten a complete myotomy of in your first surgery, when

15  you went back in and were going to do the second

16  surgery, you were going to do a complete myotomy of

17  that; is that correct?

18  A.      That's correct.

19  Q.      Did you expect to close the hole that

20  you -- the imaging study and everything was showing you

21  in the esophagus, did you expect to close that?

22  A.      We expected to close a hole.  The imaging study

23  didn't necessarily show a hole.  It just showed that

24  there was fluid in the chest, which was likely coming

25  from saliva that she was swallowing and it was going

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  through a suspected hole.

2  Q.      Okay.  Imaging was showing the results of the

3  perforation, not the hole itself?

4  A.      Correct.

5  Q.      And then you expected to put drains in during

6  the surgery; is that right?

7  A.      Yes.

8  Q.      You expected to wash out -- to suction out and

9  wash out thoroughly all the infected tissue; is that

10  correct?

11  A.      That is correct.

12  Q.      And then when you said you planned to close the

13  hole, your plan on this repair -- on this surgery you

14  were going to do that night, you were somehow going to

15  put something over the hole that was in there as a part

16  of this surgery?

17  A.      Well, going into the surgery, you don't know

18  the size of the hole, the exact location.  So the exact

19  plan of repair, you don't know for sure.  So I wouldn't

20  say I was going to put a -- something over the hole.  We

21  were going to evaluate that when we got in there.  But

22  the plan was, yes, if we saw a hole to close the hole.

23  Q.      And your expectation when you made the -- this

24  note and when you started the surgery was that you were

25  going to close the hole; isn't that correct?

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  A.        More likely than not, yes.

2  Q.        Now, let me ask you how you went in, and if you

3  could take us through kind of a step-by-step process of

4  what you were doing and what your surgical note means

5  and describes.

6           Do you have your operative report in front of

7  you?

8  A.        I do not right now.

9           MR. CALLAHAN:  Excuse me, Todd.

10          MR. JONES:  I'm sorry, Your Honor.  I'd like to

11  make this note an exhibit.

12          THE COURT:  Okay.  You propose this as

13  Plaintiff's Exhibit No. 1; is that what it is?

14          MR. JONES:  1-3- --

15          MR. CALLAHAN:  1-134 is the progress note.

16          THE COURT:  Any objection?

17          MR. GIDEON:  No.

18          THE COURT:  So moved.  Publish to the jury.

19          (Plaintiff's Exhibit 1-134 was marked and

20           received into evidence.)

21          MR. JONES:  I'm sorry, Your Honor.  It will

22  take me a little while still to get used to -- I still

23  think you have carbon paper.

24          THE COURT:  Well, we might have it somewhere,

25  but I'm not getting it for you.

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1    MR. GIDEON:  No objection to this either.

2    MR. JONES:  We'd like to make this an exhibit.

3    THE COURT:  So ordered without objection.

4    THE COURTROOM DEPUTY:  Which number was this?

5    PLAINTIFF'S COUNSELS' ASSISTANT:  1-211.

6    (Plaintiff's Exhibit 1-211 was marked and

7     received into evidence.)

8  BY MR. JONES:

9  Q.    Have you had a chance to look at it and

10 recognize it to be your note?

11 A.    Yes.

12 Q.    All right.  Now, in describing the findings,

13 what you found in the surgery, the first thing you say

14 is friable pharyngeal mucosa.  First of all, what's

15 mucosa?

16 A.    Mucosa is like the lining in your mouth.  It's

17 kind of the pinkish stuff inside your nose, inside your

18 mouth.

19 Q.    What's pharyngeal?

20 A.    That's the back of the throat.  So you have an

21 upper pharyngeal area where your tonsils would be, a

22 lower pharyngeal area, which is where the food goes

23 before it goes into the esophagus.

24 Q.    And the Zenker's diverticulum that you operated

25 on the day before, that would have been classified as

1   pharyngeal tissue; is that correct?

2   A.          That is correct.  You'll occasionally see some

3   people call it upper esophageal, but it's really

4   pharyngeal tissue.

5   Q.          All right.  And what you're finding in your

6   surgery was a small perforation at the inferior extent

7   of the previous endoscopic diverticulum beyond the

8   placement of the endoscopic staples.

9               First of all, what does the inferior extent

10  mean?

11  A.          Well, the inferior extent is the interior

12  portion.  So during the initial procedure, that septum

13  consisting of mucosa and muscle was divided with the

14  stapler, and that divided a certain portion of it.  And

15  then the last approximately five millimeters to a

16  centimeter that was left over was divided with a

17  HARMONIC® scalpel.  So you're going to have two sides,

18  almost like a V, to that division of that barrier

19  between the muscle, the sac, and the esophagus.  And so

20  there will be two sides to it.

21              When you're -- with the second procedure,

22  you're approaching it through the left side.  So you're

23  going to see the left side of those staples.  And there

24  was a small hole just at the inferior extent of that

25  staple line.

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  Q.       And "inferior to that staple line," is that

2  where you used the HARMONIC® scalpel?

3  A.       That is correct.

4  Q.       Is that where this hole was?

5  A.       It was at the inferior extent of this staple.

6  It's not a very big segment.  So it was between that

7  staple line and the very tip of the end.

8  Q.       Yeah.  Half a centimeter, maybe not in surgery

9  with your visualization, but half a centimeter is pretty

10  small, isn't it?

11  A.       It's fairly small.

12  Q.       Okay.  And one millimeter is very, very small.

13  Forgive me for saying it that way.  What's about

14  the -- a little thicker than a fingernail?

15  A.       Probably fair.

16  Q.       So where you had applied the HARMONIC® scalpel

17  in your surgery the day before, when you go in in your

18  second surgery, at that place you find a hole, a

19  perforation; is that correct?

20  A.       That is correct.

21  Q.       What do you think caused that hole?

22  A.       It could be multiple causes.  We know from just

23  doing the surgeries that those holes can be caused by a

24  stapling technique, a laser technique, HARMONIC®

25  technique.  So we know no matter what technique you can

1  have, you can get these microperforations, and almost

2  every state you look at has a potential risk of what we

3  call air leaks, which are actually small perforations.

4  There is no way of knowing when you go in there what

5  caused it.  You know there is a hole, but there could be

6  multiple factors in a surgery.

7          One, the tissue itself by nature is just very

8  friable.  That mucosa we talked about is so thin -- I

9  mean, if you put your finger underneath it, you could

10  see your glove.  So it's very thin and friable by nature

11  of itself.  It has no support to it.  So that's why it's

12  outpouching through the weakness in that area.  It has

13  no support behind it.  So it's just very thin and

14  friable to begin with.

15          And so they can get torn just putting your

16  instruments in in an initial procedure doing an

17  endoscopic approach.  They can be torn by, you know,

18  stitching it if you're stitching it.  And so it could

19  have been caused by the stapler itself.  It could have

20  been caused by tension.  It could have been caused by

21  just the nature of the tissue not being real strong

22  itself.  You know, sometimes thermal damage can cause

23  it.  So there is multiple causes, but you don't know.

24  All you can see is that there is a hole.

25  Q.      Well, you can see a little more than that

1  because you could see where this hole was; is that

2  correct?

3  A.      Correct.  It was at the inferior extent of the

4  staple line.

5  Q.      Well, it was -- this hole was not where the

6  staples were; it was below that, and it was where you

7  had applied not the staples but the HARMONIC® scalpel;

8  is that correct?

9  A.      That is correct.  But there is always a union

10  between those two areas.

11  Q.      Well, are you saying that somehow the staples

12  you put in were just as likely to be a cause of this as

13  the HARMONIC® scalpel that you used right where the hole

14  was?

15  A.      Well, there is a border.  There is always a

16  joint between two devices.  And so, yes, there is a

17  staple joint and where the HARMONIC® is.  And so there

18  is always going to be a union there, and that's where

19  the hole was.

20  Q.      Well, this hole --

21  A.      So I'm not saying it's a staple or the

22  HARMONIC®.  It could have been either one.

23  Q.      Well, this hole was found by you at the very

24  base of that septum you were trying to divide, and it

25  was approximately five millimeters below where you had

1  used the stapler; is that correct?

2  A.        That's not completely correct.  You said at the

3  very bottom of the septum.  I said when we were coming

4  from the side, you have an area that I used the

5  HARMONIC® with, and you have, like, a V-like thing, and

6  you're coming from the left side, so you're going to see

7  the left side of that suture line.  And so there is a

8  distance there.  So there is a certain amount, you know,

9  approximately five millimeters to a centimeter there,

10 and it was at the inferior extent of the staple line.

11 The very tip of it would be down at the bottom of the V

12 and it would be almost more on the side.

13        Again, like you said, it's a small area and

14 you're operating, but -- but it wasn't at the very tip,

15 what you're saying; it was at the inferior extent of

16 that staple line on the left side that we were

17 approaching on that you could see the hole.

18 Q.        You took a picture in your first operation; is

19 that correct?

20 A.        I did; I took several pictures.

21 Q.        And you took one picture where you had this

22 discolored tissue at the very base of your surgery; is

23 that correct?

24 A.        That is correct.

25 Q.        And that was down at the base of where you used

1 the HARMONIC® scalpel where you took that picture and

2 where the tissue was discolored?

3 A.      Yeah, it's at the very bottom part of the V.

4 Q.      And do you think you might not have testified

5 in this case that where this hole was found was right

6 where all that brown discolored tissue was that you had

7 photographed at the base of this septum in your previous

8 surgery?

9 A.      Well, if we can show the picture, I can

10 describe it.

11 Q.      First of all, do you acknowledge that where

12 that brown discolored tissue is is right where the hole

13 was found the next day?

14 A.      I can't say that, no.

15 Q.      Well, you're the only man that has seen it

16 twice; is that correct?  You saw the first surgery and

17 you saw the second surgery.

18 A.      Correct, but there was not a hole at the first

19 surgery.  So I palpated that area during the first

20 surgery.  So we knew there was not a hole where I

21 palpated it.  So the only time we saw the hole was on

22 the second surgery, and that's where I described it

23 there is at the inferior extent of that suture line.

24          So there is -- at the very tip of where it gets

25 divided is where the brown area is, which is likely

1    muscle fibers, which is what you'll see at the very

2    bottom because you're -- you're not doing what we call a

3    complete myotomy.  And so the bottom part of that V is

4    still going to be some of that muscle that's too tight

5    that's constricting.

6              The side of it has some coagulation.  That's

7    what that HARMONIC® scalpel that we showed earlier is

8    doing.  It's sealing and separating the tissue, and so

9    you're going to have -- on the picture that will show --

10   at some point you'll see what looks like a brown spot,

11   as I think Mr. Jones is describing, at the bottom which

12   is part of the muscle, and you see coagulated tissue on

13   the side.

14   Q.        Sir, when you found the hole, that hole was at

15   the very bottom of your cut, your surgery, the previous

16   day.  It's the bottom of that septum.  The hole

17   exists -- you found the hole at the time of the second

18   surgery.  You actually looked at it; is that correct?

19   A.        I looked at it, yes.

20   Q.        And it was at the bottom of that septum; is

21   that correct?

22   A.        Again, if you -- with respect to where the

23   staples are, it's towards the bottom.

24   Q.        Okay.

25   A.        If you're trying to get the fine, minute

1  details of where it was, it was more along the side at

2  the bottom.

3          We're talking about millimeters in distance

4  you're trying to describe.  I'm more than happy to show

5  it on a picture so we can see.  Sometimes a picture is

6  worth a thousand words.

7  Q.      We'll come to the picture.  I'm just trying to

8  find out what your real thought is about what caused

9  this hole.

10          When I asked you a minute ago, you talked about

11  stitches might have caused it.  Were there any stitches

12  in this first surgery?

13  A.      I was speaking more in general of the

14  techniques that we used to close these.  There are many

15  techniques, and what I'm saying is:  In all those

16  different techniques, you'll get air leaks; you'll get

17  holes, and so any of those things could potentially

18  cause it.  I wasn't referring to this particular case.

19  Q.      I'm sorry.  I was trying to ask you about this

20  surgery.

21          In this surgery, stitches had nothing -- the

22  first surgery had nothing to do with this; correct?

23  A.      The first surgery had nothing to do with this

24  case.

25  Q.      And the two staple lines are in both -- on

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1   both -- are off to the edges of what you're dividing

2   when you're using the stapler; is that correct?

3   A.      Once you've stapled it, yes, they divide off to

4   the side.

5   Q.      Number three is a small perforation at the

6   inferior extent of the previous endoscopic diverticulum

7   beyond the placement of the endoscopic statements.

8   Those are the words that you chose.

9   A.      Correct.

10  Q.      The interior extent, that means the very

11  bottom; is that correct?  That's what the words mean;

12  isn't that correct?

13  A.      Well, inferior is below the staples.

14  Q.      I'm sorry.  The inferior extent is at the

15  bottom below the hole staples; at the end of the septum

16  is where you're describing?

17  A.      So where I used the HARMONIC® scalpel was

18  inferior to where the staples were.

19  Q.      Do you think the Harmonic® scalpels caused this

20  hole?

21  A.      It is possible that the tissue did not seal

22  after the Harmonic®.  That is a possible cause.

23  Q.      Do you know of any other possible causes?  Not

24  just theoretically how you get a perforation in surgery,

25  but how this perforation, how you got this one, other

1 than the HARMONIC® scalpels?

2 A.        Yes.  Like we talked about the tissue being

3 friable.  So even when you seal it with any technique,

4 the tissue doesn't just stay sealed.

5 Q.        Okay.  Well, in the first surgery, you

6 described this tissue.  Did you use the word "friable

7 tissue" when you did the first surgery?

8 A.        I don't believe I described it in my note, but

9 by nature, it's friable.

10 Q.        Well, in your -- at the time of your first

11 surgery, did you look at the tissue where you were using

12 the HARMONIC® scalpels and say before you turned the

13 power on, "Boy, this is friable tissue I'm about to

14 energize"?

15 A.        I did not.  But as an ENT otolaryngologist, you

16 know it's friable when you're doing the procedure.  When

17 you're placing that diverticular scope, as you saw in

18 the pictures, it has two bevels, and you're placing it

19 in position.  You've got to be very careful that your

20 scope itself doesn't tear that sac or diverticulum

21 because it's friable.  So we know it's friable even

22 before we do the surgery.

23 Q.        Okay.  So that's what your thought process was

24 at the time of the first surgery?

25 A.        Correct.  It should be -- it should be every

1  ENT'S thought process because part of that doing the

2  surgery is knowing that sac is just friable tissue.

3  It's very thin.  It's very easily torn during a

4  procedure.

5  Q.        Okay.  So you said that should be every

6  surgeries -- surgeon's thought process; is that correct?

7  A.        Correct.

8  Q.        And in the standard of care, every reasonable

9  surgeon that does this is expected to know that this

10 tissue where you were using the HARMONIC® scalpels is

11 very thin and very likely to be exposed to a perforation

12 if I don't use the highest care; is that fair?

13 A.        If you don't use what?

14 Q.        If I don't use the highest care, my best

15 judgment, if I'm not paying attention, at the top of my

16 game, this tissue is really vulnerable and I have a good

17 chance of perforating it; is that fair?

18 A.        Yes, it has to be in the back of your mind,

19 that's correct.

20 Q.        And that's the standard of care for you when

21 you did this first surgery; is that correct?

22 A.        Yes, that was in my mind during the surgery.

23 Q.        Okay.  Now, would part of using the highest

24 level of care mean that I've got to know what my

25 instruments are and how they're controlled and how to

1  operate them and what the possible effect of those

2  instruments are on the adjacent tissue a millimeter or

3  so away?  The surgeon doing the surgery you did the

4  first day by the standard of care had to have that

5  thought and that knowledge and had to proceed like that;

6  is that correct?

7  A.      That is fair.

8  Q.      And you knew that if you didn't proceed like

9  that in your first surgery, with that knowledge and that

10  ability to use the instruments you were using and your

11  knowledge -- and that knowledge about how they would

12  affect tissue, if you didn't have that knowledge or you

13  didn't use it at the time of the first surgery, that

14  would be a violation of the standard of care for you?

15  A.      That is fair.

16  Q.      Okay.  When you did this first surgery, what

17  power level were you using on the HARMONIC® scalpel?

18  A.      It was a power of three.

19  Q.      Did you remember that?

20  A.      I did not recall at the time of deposition.

21  Q.      Well, do you remember it now?

22  A.      I do.

23  Q.      So when did that memory come back to you that

24  you didn't have when I took your deposition?

25  A.      The day of the deposition.

1  Q.        Do you remember me asking you in your

2  deposition, Doctor, do you have any memory of that

3  surgery, the endoscopic Zenker's surgery, other than

4  what's in your operative note, and you saying, No,

5  that's all I remember.

6  A.        Correct.

7  Q.        And then you're telling us even though that had

8  been, I guess, almost several years at that point from

9  the time of the surgery, that afternoon after the court

10  reporter leaves, after I leave, Oh, I remember now it

11  was three.  I remember using the three.  Is that what

12  you're saying?

13  A.        I discussed it with Dr. Bunge after our

14  deposition and he reminded me of the settings of the

15  Harmonic®.

16  Q.        Okay, sir.  You discussed with Dr. Bunge what

17  the settings were when we took a recess in the

18  deposition, and he says, The settings are three and

19  five.  He told you the settings were three and five

20  during a break in the deposition, didn't he?

21  A.        That's correct.

22  Q.        And then do you remember me asking you, Doctor,

23  do you have any memory of that now that he's told you,

24  and you saying, I still don't know what the settings

25  were that I used?

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  A.      I don't -- I don't remember the order you asked

2  me the questions.

3  Q.      It will take me a while to pick that out, but

4  we'll come back to this.

5          After your deposition, and you have 30 days to

6  do an errata sheet and clean up and correct what you

7  have said incorrectly, did you make an errata sheet

8  change that says, I do remember what the setting was

9  that I used and it was a three?

10 A.      I don't recall making any changes in the

11 deposition.

12 Q.      Well, sir, you understood the depositions were

13 under oath and were for a serious purpose for this

14 lawsuit?

15 A.      I understand that.

16 Q.      And one of the purposes in this deposition was

17 to find out what your memory was, what you knew and your

18 thought process; you understood that?

19 A.      I understood that.

20 Q.      And by that afternoon -- was it before -- was

21 it before the deposition closed or was it -- or did you

22 remember this during the deposition?

23 A.      You asked me a question during the deposition.

24 I just did not remember the settings at the time.

25 During a break, I just didn't remember the settings at

1  the time.  I asked Dr. Bunge.  He reminded me of the

2  settings.

3  Q.      Okay.  What Dr. Bunge told you was that this

4  machine you were using has two power settings that

5  basically are used most of the time.  One is a five.

6  That can never be changed.  And one is a three, and it

7  can be changed, but it's not usually changed.  Isn't

8  that what you learned?

9  A.      Oh, I remembered that.  We know there is two

10  settings on it.  There is a minimum and a maximum

11  setting.  Those are default settings, and when you plug

12  in the instrument, they're defaulted to a three and a

13  five.

14  Q.      Well, if you didn't even know what the settings

15  were, how did you all of a sudden after the deposition

16  remember, Oh, I was using a three?  How did you get that

17  memory?

18  A.      Because that's the minimum setting on -- there

19  is a button on the handpiece.  We can show it again, but

20  there is a minimum and maximum setting on the handpiece

21  that correlates to those numbers.

22  Q.      Okay.  And how did you remember which one you

23  used?

24  A.      Because I always use the minimum.  The maximum

25  kind of goes through the tissue at a faster pace.  And

1    you can hear it.  There is a sound that gives off when

2    you're going through the tissue, that the machine gives

3    off.  And I always use minimum.

4         About the only time I'll use maximum is when

5    you can see right through the tissue on a head/neck

6    cancer case.  So it's an instrument that I use

7    frequently.  I use it for all my thyroid surgeries,

8    parathyroid surgeries, head and neck cancer surgeries.

9    So it's an instrument that I'm using frequently.

10        The technicians in the operating room are the

11   ones that plug it in.  They set it.  It has default

12   settings.  I've never changed those default settings.

13        And so did I forget the settings at the time?

14   Yes, but it was -- it was the same settings I always

15   use.  And rarely do you ever even change the settings.

16   I don't know of anyone that changes them past the

17   default settings.

18   Q.      Well, do you always use three in every surgery

19   you do?

20   A.      Three or five.  Remember, there are two

21   settings.  There is a minimum and a maximum.

22   Q.      Okay.

23   A.      So, as I said, there are times I do use the

24   maximum setting in certain surgeries.  But the minimum

25   setting will take a slower time dividing the tissue.

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  Q.       You use three sometimes in some surgeries and

2  five sometimes in some surgeries, but you say, I

3  specifically remember using the smaller setting, the

4  minimum setting, when I did this surgery?

5  A.       Yes.

6  Q.       Why?  Why would you use the minimum setting?

7  A.       I just said it divides the tissue more slowly.

8  It seals the tissue better.  So the maximum setting

9  won't seal the tissue as well.

10  Q.       Okay.  So if -- for this surgery, to do it

11  safely under the standard of care, you should do this

12  surgery at a setting of three, the minimum setting; is

13  that correct?

14  A.       That's the setting I choose.

15  Q.       And do you choose that because it's safe for

16  the patient?

17  A.       I think it is.

18  Q.       And do you think most surgeons doing this

19  surgery with HARMONIC® scalpels, and you were trained at

20  Mayo, would recognize that three was safer for the

21  patient than five?

22  A.       I think most would, but I can't speak for other

23  physicians.

24  Q.       But you have always known that since Mayo; is

25  that correct?

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  A.      Oh, I've known that probably since before Mayo.

2  We used the HARMONIC® scalpel when I was at MD Anderson.

3  Q.      Do you recall in your deposition testifying you

4  didn't think it would make any difference for this

5  surgery what setting was used?

6  A.      I don't recall that.

7  Q.      If you said that, would that be a mistake?

8  A.      Well, I'd like to see the statement so I can

9  see the whole statement.  But, like I said, if another

10 surgeon decides to put it on five, it still seals.

11 That's what that Harmonic® does.  It seals and divides

12 the tissue, but it does it at a faster rate.

13 Q.      Well, in your hands with your skills and your

14 knowledge and the way you use this instrument, for you

15 to do it, to give the maximum patient safety and be

16 consistent with the standard of care, in your hands,

17 it's needed to be done at a three; is that fair?

18 A.      I believe it should be done at a three.  But I

19 can't say that's the standard of care.

20 Q.      Well, if in your hands it's safer to do it at a

21 three for your patients, aren't you required to do

22 what's reasonable and to do what is best in your hands

23 and use a three?

24 A.      In my hands.  But I can't say that that's going

25 to be the same in someone else's hands.

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  Q.       Somebody else might have different skills and

2  be able to use a five?

3  A.       Correct.

4  Q.       But in your hands with your skills and the way

5  you're trained, you need to use a three for this surgery

6  for patient safety, and that basically is what you're

7  required to do to give reasonable care for your patient;

8  is that correct?

9  A.       That's correct.

10         To give a good example of a corollary, the

11  laser, which some people use, some people use a laser on

12  a power watt setting of five.  Some people use it on a

13  power watt setting of seven.  If a surgeon decides to

14  use that as a seven, I can't argue with him that he

15  should have used five.  So everyone has different

16  techniques in their own hands.

17  Q.       Okay.  But the standard of care is for each of

18  those surgeons to use what is the safest in his hands or

19  in her hands?

20  A.       That is correct.

21  Q.       Okay.

22         MR. JONES:  Judge, I'm out of order, and it

23  will just take me one moment.

24         THE COURT:  That's all right.

25

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1   BY MR. JONES:

2   Q.      Doctor, I want to show you on page 74 of your

3   deposition --

4           MR. JONES:  If we can take down the previous

5   exhibit.  I'll come back to that.

6   BY MR. JONES:

7   Q.      As you'll see from the previous page on 73, you

8   just said that Dr. Bunge told you about the three and

9   the five settings and that that's what they were.

10          And what did you say to Dr. Bunge and what did

11  he say to you?  I said I couldn't recall the settings.

12  And he said there are only two settings, three and five.

13  And there are standard settings.  I said, Is three a

14  higher energy?  He said, Five would be a higher energy.

15  That's what you said.  And that's the first time I've

16  used three and five when I questioned you.  Other than

17  my questions, had you ever heard of that before?  Yes, I

18  didn't recall what my settings were because usually I

19  have the standard setting which we discussed before with

20  thyroids.  And I asked you what's your standard settings

21  for thyroids, and he says, I don't recall.

22          And then coming back, so after that discussion,

23  Is there any way you know of to find out how it was set

24  in this surgery?

25          What was your answer under oath in that

1  deposition, Doctor?

2  A.       My answer would be when they plug in the

3  machine, it is set to the default settings.  I didn't

4  ask for anyone to change it.  So it would have been the

5  default settings.

6  Q.       What answer did you give under oath when I

7  asked you that question?

8  A.       I said, "I don't know."

9  Q.       Was that the truth?

10  A.       I don't know throughout the surgeries at the

11  time because I had already said before I didn't remember

12  the settings of three and five.

13  Q.       Well, after you found that out, and that's why

14  I started the page above, you said you had that

15  conversation during the deposition break with Dr. Bunge,

16  and he told you it was three and five, and I come

17  back -- we talked about you don't recall the settings in

18  other surgeries.  I said, Is there any way you know of

19  to find out how it was set where?  What are my words?

20  In this surgery?

21  A.       And I said, "I don't know."

22  Q.       Okay.  Is that the truth?

23  A.       Well, I can't go back in time and look at the

24  monitor, but I know when they plug it in, they set it to

25  the default settings.  So unless a surgical tech decided

1  to change the default settings, which would be out of

2  the standard in an operation, it would normally be at

3  three and five.  And I don't know of any technician that

4  would just go and change -- change it from the default

5  settings.

6  Q.      Did you go back through and try to look at the

7  operative record?

8  A.      We don't -- those aren't recorded.  I don't

9  know of any record where you actually record the default

10  settings of a Harmonic® because I don't know of anyone

11  that uses other settings other than three and five.

12  Q.      Well, how soon after this deposition -- how

13  long did it take you to realize, I was using the minimum

14  power, the three?

15  A.      Repeat the question.  I'm not sure what

16  you're --

17  Q.      Sure.  You said you didn't know during the

18  deposition that you were using it at minimum power, but

19  you realized that afternoon it was -- you were using

20  minimum power.  How long after the deposition was that

21  before you had that realization?

22  A.      So what I didn't know was the power settings,

23  the three and the five.  I did not recall those numbers

24  on the machine.  I didn't say I didn't remember whether

25  I pressed minimum or maximum on the handpiece.  That's a

1    different question.  So I did not remember the power

2    settings.  They're default settings.

3    Q.        I asked you repeatedly about how the machine

4    was operated and how you set it.  Did you ever say, I

5    used the lower power setting in your deposition?

6    A.        I don't recall if I did or did not.  The line

7    of questioning was regarding knowing the power settings

8    and remembering the power settings, which I did not

9    remember at the time of the deposition.

10   Q.        All right.  We'll come back to this area in a

11   little bit, but let's go back to the exhibit that's up

12   there.  It says "friable pharyngeal mucosa" under

13   Findings.  Do you see that?

14   A.        Yes, I think we've gone over this.

15   Q.        And you've told us you found, quote, "friable

16   pharyngeal tissue" in the first surgery, but you didn't

17   put that in your note?

18   A.        I did not put that in my note.

19   Q.        Was this tissue different than it was the day

20   before?

21   A.        Well, we had operated on that tissue.  So the

22   effects of the Harmonic® and the stapler, whatever

23   effects those had on the tissue.

24   Q.        Well, other than that, when you were doing the

25   second surgery and you got to this area of the Zenker's

1  diverticulum, was this tissue worse, more friable, more

2  infected, more breaking down than it was at the time of

3  the first surgery?

4  A.      It's not a comparative question because when

5  you're doing the first surgery, the point of that first

6  surgery is to divide that septum.  I described in the

7  first surgery that I gently palpated the sac and the

8  area with what's called an anesthesia Bougie.  It's just

9  a long, kind of malleable, soft rubber tubing.

10       In the second surgery, you're actually holding

11  the tissue.  You're suturing the tissue.  So it's a

12  different texture, a feel.  And so it's not a

13  comparative question to say is it more or less friable

14  because you have different contact with the tissue than

15  you do with the first surgery.

16  Q.      Okay.  Did you think this friable -- the tissue

17  was friable the second -- in the second surgery because

18  it was infected?

19  A.      It was not infected.  The infection was farther

20  inferior in the mediastinum, and that's described in the

21  operative report.  We found the diverticulum and we

22  went -- we were lifting up the esophagus inferiorly, and

23  that's where we found the infection was in the

24  mediastinum.

25  Q.      Okay.  So you didn't see anything on the

1  diverticulum side that indicated infection to you at the

2  time of the second surgery; is that right?

3  A.      No.

4  Q.      Was it inflamed?

5  A.      To some degree, yes, because the tissue had

6  been treated with a Harmonic®.  So you're going to get

7  some inflammation from using that HARMONIC® scalpel.

8  When it seals and coagulates it, you're doing some

9  damage.  That's what the sealing of that Harmonic® does.

10  You're coagulating the tissue.  So there is going to be

11  some inflammation there.  And that's reflected in, I

12  think, the pathology report later.

13  Q.      Well, Doctor, other than where you're pushing

14  those tongs down and you've got tissue in-between,

15  that's where when you use a HARMONIC® scalpel, you're

16  changing the tissue; is that correct?

17  A.      I didn't hear all of the question.

18  Q.      You see these tiny -- do you see these tiny

19  little --

20  A.      Yeah, I'm familiar with the instrument.

21  Q.      Okay.  When you seal it --

22          THE COURT:  Mr. Jones, could you move closer to

23  the microphone.  I'm having difficulty hearing you and I

24  think they might, also.

25          MR. JONES:  Okay.  I apologize.  Thank you.

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  BY MR. JONES:

2  Q.        You've got about a millimeter-wide top and

3  bottom, and you clamp tissue between it, and then you

4  hit the fire button, the on, to make it operate?

5  A.        Correct.

6  Q.        What you're doing is trying with these

7  HARMONIC® scalpels to change the tissue that's between

8  these two little, tiny tips; isn't that correct?

9  A.        That's correct.

10  Q.        And these two little, tiny tips are maybe a

11  millimeter in width?

12  A.        I'd have to measure them.  It's close to that.

13  A little bit bigger maybe, but --

14  Q.        And the Zenker's diverticulum pocket is --

15  what? -- two centimeters in width?

16  A.        In width?

17  Q.        Yeah.

18  A.        I didn't measure the width.  So I -- you could

19  approximate from the picture, but -- I'd have to look at

20  the picture, but it's, actually, you know, from the

21  picture because you're only getting a certain view of it

22  with your scope, and so all you can see is from with

23  your scope.  But, you know, probably a

24  centimeter-and-a-half wide.

25  Q.        And so when you clamp this in a particular

1  place, how far away from this -- to make the rest of the

2  diverticulum pocket friable, how far does it become

3  friable from where this is actually clamped?

4  A.      Well, the studies show it -- the thermal damage

5  laterally is about 1.69 millimeters.

6  Q.      Okay.  Did you know that when I took your

7  deposition?

8  A.      I did not know that at the time.

9  Q.      When did you get that knowledge?

10 A.      During a review of the literature for this

11 case.

12 Q.      When you're using this operation in a patient

13 who has trusted their body to you, don't you as a good

14 surgeon need to be aware that you're going to get damage

15 on each side, potentially, of about another

16 1.67 millimeters?

17 A.      Well, again, we use that instrument in multiple

18 surgeries, surgeries that have, really, more fine,

19 delicate nerves; mainly thyroid surgeries.  And so we

20 use that instrument all the time.

21         So this -- in terms of this surgery, that

22 lateral thermal damage, there is no extremely-important

23 structures that are going to be -- have thermal damage,

24 not nearly comparative to a thyroid surgery.

25 Q.      Well, you're saying in thyroid surgeries, there

1    is more important tissue within that 1.67 on each side

2    than there is when you're doing this Zenker's; is that

3    correct?

4    A.        Correct.

5    Q.        You're not saying that you won't damage that

6    1.67 on either side.

7    A.        Yeah, there is always that possibility when the

8    instrument can -- any instrument is going to have some

9    lateral thermal damage.  Even a stapler has traumatic

10   damage when you staple it.

11        And so there is always going to be some degree

12   of lateral damage to the tissue when you're cutting it,

13   whether it be a simple -- what we call a cautery where

14   you almost get like a heated pencil device, which I

15   think you referred to before, which they used early on

16   back, I believe, in the '60s, and it had lots of issues

17   with that, and that's why the technique was abandoned

18   back into the late -- you know, early '90s when the

19   stapler came in.  And then the laser was introduced in

20   the '80s.  And the HARMONIC® scalpel was introduced, you

21   know, more in the late 2000s.  And so every instrument

22   is going to have some type of lateral damage.

23        The Harmonic®, the whole point of using a

24   Harmonic®, it is thought to have less traumatic damage

25   than a lot of those other techniques.

1 Q.        All right.  However important you thought that

2 tissue was, it was important enough -- because it's so

3 thin or friable, or whatever it was to start with, in

4 your testimony, it's important enough to know that if

5 I'm within 1.67 millimeters of going through that

6 tissue, I can create a perforation; is that correct?

7 A.        Well, I didn't say that's -- lateral thermal

8 damage in going through a perforation is different.

9 Lateral thermal damage is the heat damage created

10 laterally.  That doesn't mean it's going to cause a

11 perforation.  I mean, the whole point of a Harmonic® is

12 to -- with that energy from the vibration -- it's an

13 ultrasonic machine.  So it's going to vibrate at a high

14 frequency.  And it seals and coagulates.  So

15 coagulation, by nature, is going to be some type of a

16 thermal damage.

17        You fry an egg too long and you're going to

18 coagulate that egg yolk on your pan.  That's thermal

19 damage.

20 Q.        Well, if you were in -- within 1.67 millimeters

21 of either side where you were firing up and hitting that

22 button, if you were within 1.67 of the mucosa in the

23 opening into the retroperitoneal space, you could

24 destroy and damage it enough so it would die, even if it

25 died an hour after your surgery.  You could kill that

1  tissue and cause a perforation, and that's something you

2  recognized when you did this surgery; is that right?

3  A.      It is possible, but that's the whole point of

4  using a HARMONIC® scalpel is it causes less damage than

5  the other instruments that we have.

6  Q.      Okay.  You've told us that's why the HARMONIC®

7  was a good choice.  My question is:  You had to realize

8  when you were using the HARMONIC® that if you applied

9  them and you were within 1.67 millimeters of tissue that

10 would end up causing this hole, you were making a

11 mistake and you were outside the standard of care; is

12 that correct?

13 A.      I guess I'm not making clear your -- by nature

14 of what you're doing with the surgery, you're sealing

15 the tissue.

16 Q.      Well, at the time you were using the HARMONIC®,

17 did you divide the tissue within 1.6 millimeters of the

18 end of the septum?  Did you think you were that close?

19 A.      You're close.

20 Q.      Were you that close?

21 A.      It's a fair approximation.

22 Q.      Okay.  So it's a fair --

23 A.      The point of the surgery is to divide all the

24 septum that you can.

25 Q.      All right.  And what's below the septum?

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  A.       In this circumstance, in my surgery, it's the

2  muscle.  It's that cricopharyngeal muscle, or as you

3  referred to it, the CP muscle.

4  Q.       The muscle is on one side of where you were

5  dividing, but if you divided that whole septum, that

6  muscle is there, and right outside, right next to that

7  muscle, 1.6 millimeters away, would be an open space; is

8  that correct?

9  A.       Not necessarily.  If you think about that

10  septum, and it's a -- almost a concentric muscle.  It's

11  attaching to a -- it's like, kind of, a ringed

12  cartilage, and it's concentrically coming around and

13  you're dividing this muscle, lateral to that muscle is

14  still more muscle.  There is a pocket of this mucosa

15  that's kind of adjacent to the muscle, and so that's

16  what it's doing is:  It's kind of sealing the muscle and

17  mucosa together and dividing it.  So lateral, you would

18  actually have more muscle.

19       And it all depends on the -- you know, how big

20  of a pocket you have.  If you have a much bigger pocket,

21  that's going to change that answer.

22       But on Ms. Foster's case, it was only a

23  two-centimeter pocket.  That cricopharyngeal muscle is,

24  on average, about four to five centimeters in length.

25  So when we're dividing it, you still have more muscle

1   deep to you.  And you're dividing the muscle, so there

2   is still kind of muscle on the side of you as well with

3   the mucosa of the pocket and with the mucosa of the

4   esophagus.

5   Q.      Did that muscle come within

6   1.6 centimeters -- or millimeters of the open space?

7   A.      I'm not sure what you mean by an open space

8   because deep -- deep to all of this there is tissue.

9   There is -- you know, even behind the Zenker's

10  diverticulum, it's a thinned out one.  It has some fat.

11  It has some tissue.

12          So there are theoretical spaces in the neck

13  that are normally closed.  They can become what we call

14  potential spaces, which is what happened with

15  Ms. Foster when there was a leak, and most likely slide

16  was going through that leak or what we call a

17  microperforation.  It created an actual space where that

18  saliva tracked down into the mediastinum and caused a

19  mediastinitis.

20          And so when you mean "open space," there

21  weren't any, really, open spaces; there are potential

22  spaces that can be caused -- created.

23  Q.      In simple terms -- there may not be simple, but

24  as simple as I can get it -- you realized that in this

25  surgery you were within 1.6 millimeters at times when

1  you were using the HARMONIC® of an area that if you

2  damaged tissue, you could have a perforation?

3  A.        Yes, I understand that.

4  Q.        Okay.  And that's the truth, isn't it?

5  A.        That's the what?

6  Q.        And that is the truth?

7  A.        Yes.

8  Q.        When you saw this hole, did you think it could

9  have been caused by thermal damage from your HARMONIC®

10 scalpel?

11 A.        Yes, that is one thought.

12 Q.        And what other thought did you have; what other

13 possibility did you come up with?

14 A.        Well, another possibility is that the tissue

15 itself just breaks down.

16 Q.        Okay.  And what would cause it just to break

17 down?

18 A.        Well, again, by nature, it's friable tissue.

19 So it may not seal.  You know, just the normal act of

20 swallowing, doing the things we do, and if it doesn't

21 seal well, it just opens back up.  If a tissue is

22 friable by nature, it can open back up.

23 Q.        So this tissue for 70 some years had been in

24 her throat and it had been like that, and it just

25 happened right after your surgery to decide that I've

1  had as much as I can take, I'm too friable, I'm going to

2  break apart; is that sort of what you're thinking?

3  A.      No, that's exactly not what I'm thinking.

4  That's not what I said.   There is certainly a

5  possibility that, you know, things we did during the

6  surgery, because we know that, you know, doing the

7  surgery alone has a risk of that microleak that could

8  have caused it.   I just can't say exactly what the cause

9  of it was.   And that's what I was trying to convey

10  earlier.   Despite the different techniques that we use

11  to do this, all the techniques all have that possibility

12  to have a microleak, a perforation.

13      So there are techniques that commonly are used,

14  stapling alone, $CO_2$ laser, that have that chance of a

15  microleak, and they all have a chance of perforation.

16  Q.      All right.   Let me take a little different term

17  in light of that testimony.

18      You realized when you did this surgery there

19  was a chance that the way you were going to use the

20  instrument, you would cause a microperforation?

21  A.      Yes.

22  Q.      And a microperforation is where you don't

23  damage the tissue enough so it just completely opens,

24  but it's so weak that it can't hold any more and it

25  starts leaking, that process of leaking; is that

1  correct?

2  A.        Correct.

3  Q.        And what is being leaked in this area is

4  saliva, generally; is that correct?

5  A.        Initially it was probably air and eventually

6  probably saliva.

7  Q.        Okay.  And as that saliva gets into the tissue

8  in this micro process, if that -- if that saliva is

9  infected, it's going to make this breakdown process

10  worse and quicker; is that fair?

11  A.        Well, the saliva is not infected.  The saliva

12  goes through this hole and it keeps collecting and keeps

13  tracking down into one of those potential spaces I

14  talked about.  And then once it starts collecting, and

15  in her case, in the mediastinum, when it sits there, any

16  typical fluid that's not in a space where it's supposed

17  to be has a risk of getting infected.  It would be like

18  an ear infection.  You have adults that have fluid

19  behind your eardrum all the time.  Little kids get fluid

20  behind your eardrum, they get infected.

21        And so when that saliva kept tracking down into

22  the mediastinum and sat there, then the bacteria starts

23  growing and it causes the infection.

24        But the saliva going through the hole is not

25  necessarily infected.  The tissue around it is not

1  necessarily infected.  It's what happens as a result of

2  that saliva going down into the chest and sitting there.

3  Q.      Well, is the microperforation a gradual

4  process?

5  A.      I don't think we know exactly what causes -- if

6  it's gradual, instantaneous.  I mean, they're usually

7  detected after surgery when someone has air in the neck

8  like Mrs. Foster did.

9  Q.      Sir, this was a clean-contaminated surgery; is

10 that correct?

11 A.      This is considered a clean-contaminated

12 surgery.

13 Q.      And that's for classification of when you're

14 supposed to give prophylactic antibiotics; is that

15 correct?

16 A.      That is not correct.

17 Q.      Isn't that why we have the classification of

18 clean-contaminated?

19 A.      Well, initially the whole reason we started

20 with these recommendations is it would cut down in

21 surgical site infections.  So they made these very broad

22 recommendations of giving prophylactic antibiotics.

23         Well, over time, people have looked at whether

24 that actually helps or not.  And so, you know, we

25 presented an article.  It was actually in the ENT

1  literature looking at the use of prophylactic

2  antibiotics in head and neck procedures.  That article

3  found that certain clean-contaminated procedures, such

4  as tonsillectomies, septoplasties, rhinoplasties,

5  they're all clean-contaminated procedures, and there was

6  a strong recommendation against using antibiotics.

7          In all those surgeries, there is actually an

8  opening of mucosa of the tonsil of the septum.  In our

9  actual case in this clean-contaminated surgery, you

10  actually have sealing of the tissue.

11          So comparatively to those different types of

12  clean-contaminated surgeries in ENT that they found no

13  recommendation for antibiotic usage, this was --

14  theoretically has a lot less risk of having need for a

15  prophylactic antibiotic than those surgeries.

16          Now, the second case, that same article found

17  that head and neck surgeries -- and what I mean by that

18  is surgery where you go through the head and neck,

19  cancer cases, which would be more likened to the second

20  surgery we did, there is a recommendation for using

21  perioperative antibiotics, and for the second surgery,

22  she had antibiotics.

23  Q.      Okay.  Your association of head and neck

24  surgeons has a recommendation that in head and neck

25  surgery involving pharyngeal tissue that's

1    clean-contaminated that you give prophylactic

2    antibiotics; is that correct?

3    A.        I just quoted a study that said the pharyngeal

4    tissue, which is the back of the throat where the

5    tonsils are, does not recommend prophylactic

6    antibiotics.  In fact, it is now contraindicated to give

7    antibiotics for a tonsillectomy.

8    Q.        Okay.

9    A.        And that is in the pharyngeal tissue.

10   Q.        I will come to that and deal with it, but your

11   association has guidelines -- and we'll deal with the

12   tonsils -- that say for head and neck clean-contaminated

13   pharyngeal surgeries, you're supposed to administer

14   prophylactic antibiotics; isn't that correct?

15   A.        I can't agree with that.

16   Q.        Are you familiar with a handbook for

17   antibiotics of your association for head and neck

18   surgery?

19   A.        Well, again, define head and neck surgery.

20   We're talking about specific procedures versus the

21   handbook.  And, like I said before, those

22   recommendations have changed over time.  We have to use

23   the best available information to update those

24   recommendations over time.

25              And so initially the goal of these treating

1  surgical site infections, which this was not a surgical

2  site infection; the infection was in the mediastinum,

3  not at the surgical site, but those recommendations were

4  sweeping recommendations that were made to try to

5  prevent surgical site infections.  And so that's why you

6  look at the literature.  That's why people study that to

7  see if there is benefit.

8  Q.      Okay.  I want to deal first with the sweeping

9  and then we'll clean up with the dust pan in the

10  corners.  But the sweeping recommendation of your

11  association is that if it's a clean-contaminated head

12  and neck surgery case involving pharyngeal tissues,

13  you're supposed to administer prophylactic antibiotics;

14  is that correct?  That's the sweeping --

15  A.      I just gave you an example, but I do not feel

16  that's correct.

17  Q.      That's the sweeping recommendation; is that

18  correct?

19  A.      No, that's not correct.

20  Q.      Well, you say that we've made a change in

21  regard to tonsils.  A change from what?

22  A.      Previously people would give prophylactic

23  antibiotics.

24  Q.      Not only would they give it, but the

25  association was recommending it; isn't that correct?

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1    A.        They did.

2    Q.        Okay.  And then they did studies with the

3    tonsils themselves, and they -- based on those studies,

4    they have changed the recommendation for tonsil surgery;

5    isn't that correct?

6    A.        That is correct.

7    Q.        Have they ever changed it?  Has your

8    association ever changed the recommendation for

9    endoscopic Zenker's diverticulum surgeries?

10   A.        There never was any specific recommendations

11   for Zenker's diverticulum.

12   Q.        Only the general recommendation pharyngeal

13   clean-contaminated usage; isn't that correct?

14   A.        Well, again, you have to use your best

15   available knowledge to say, head and neck surgery, what

16   type of surgeries are you talking about and is there

17   benefit?

18            So, I mean, we can't do a study for every

19   single procedure and have specific recommendations.  We

20   know these cases, there is about two out of

21   100,000 -- per population, on average, two patients out

22   of 100,000 in a year will have these.  So they're fairly

23   rare.

24            And so there are certain conditions that you're

25   just not going to have real good studies on.  And we'll

1 talk about more studies throughout this case, but, you

2 know, generally, the numbers in these studies are not

3 high-number studies.

4           And so you have to extrapolate that information

5 and use it to the best of your availability because

6 there is not always specific information you can

7 extrapolate to that case.  That's why I was referencing

8 that study that looks at the best recommendations for

9 antibiotic usage.

10          So you can cause more harm by giving

11 prophylactic antibiotics than you can do good, and you

12 always have to balance that advantage versus

13 disadvantage.

14 Q.       And in your view, you need to be careful and

15 not give antibiotics unless you know you have a real

16 need for them and that the benefits of giving the

17 antibiotics clearly outweigh any downside; is that

18 correct?

19 A.       That should be true for any procedure --

20 Q.       Okay.

21 A.       -- in medicine.

22 Q.       That's the standard of care for you in your

23 practice; is that correct?

24 A.       That's a standard for medicine is first do no

25 harm.

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  Q.        Okay.  Did you prescribe antibiotics to

2  Mrs. Foster?

3  A.        I did.  Prior to surgery, I gave her an

4  antibiotic for a suspected sinus infection.

5  Q.        Why?  Why?

6  A.        Because I suspected a sinus infection.

7  Q.        Did you examine her?

8  A.        No, I did not.  She was -- well, I got a phone

9  call approximately a week before surgery.  We have

10 multiple locations in our office, and I was in Kentucky

11 at the time, and I got a message that she had symptoms

12 of a sinus infection.  And so we treated that sinus

13 infection with amoxicillin.  We treated her with a

14 seven-day course of amoxicillin twice a day for what was

15 a suspected sinus infection based upon the symptoms that

16 she was calling about.

17 Q.        Okay.  And you thought, I don't need to see her

18 and examine her; I don't need to get blood tests or

19 cultures; it's -- it's safe enough to give antibiotics

20 just on the suspicion of it without any confirming

21 laboratories; is that correct?

22 A.        Well, one, like I said, I was in Kentucky --

23 Q.        Is that correct?

24 A.        Oh, we don't normally get laboratory values for

25 a simple sinus infection.

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  Q.       But do you normally see the patient before you

2  do it?

3  A.       We try to, but that is not a practical -- not

4  always practical.  Again, I was two-and-a-half hours

5  away.  So you have to use the best available information

6  to treat your patient.

7  Q.       And was it your judgment, I'm not going to use

8  prophylactic antibiotics for this surgery because this

9  patient's already on antibiotics?

10 A.       I do not typically give prophylactic

11 antibiotics for this surgery.

12 Q.       Okay.

13 A.       So if she had not called with symptoms of a

14 sinus infection, I would not have prophylactically given

15 her an antibiotic prior to surgery.  That is not my

16 routine for this particular surgery.

17 Q.       Okay.  Do you know of any academic institutions

18 where the residents are taught don't use prophylactic

19 antibiotics for this surgery?

20 A.       For this particular surgery?

21 Q.       Yes, sir.

22 A.       Well, Mayo Clinic.

23 Q.       Okay.  So when you were at Mayo, they told you

24 not to do it; is that correct?

25 A.       I don't recall specifically them saying that,

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  but -- I don't believe we ever discussed that, but I

2  don't remember that off the top of my head.

3          But, you know, we have journal articles, one

4  from the Mayo Clinic, that specifically describes that

5  it's not recommended for Zenker's diverticulum.

6  Q.      Okay.  So you've got an article from Mayo that

7  says don't use it --

8  A.      We do.

9  Q.      -- during this surgery?

10  A.      We do.

11  Q.      Okay.  Have you produced that in this case?

12  A.      We have.

13  Q.      And what is the name of that article?

14  A.      It's by Baron and Case.

15  Q.      All right.  And they say don't use it.  And

16  it's a surgery you were performing?

17  A.      It's a surgery that we perform for Zenker's

18  diverticulum.

19  Q.      Not flexible; is that correct?

20  A.      It is for flexible.

21  Q.      Okay.  Were you performing flexible?

22  A.      I was not, but the technique is the same.  In a

23  flexible endoscopic case, the purpose of the surgery is

24  still the same; you are dividing the septum.

25  Q.      Do ENT otolaryngologists, head and neck

1 surgeons, do they, that you know of, ever perform a

2 flexible surgery?

3 A.        I don't know specifically.  I know those same

4 two GI surgeons have written a paper with a faculty from

5 the ENT department on Zenker's diverticulum.  So they

6 certainly collaborate.

7        Am I in there with every single procedure in

8 the Mayo Clinic in the GI department?  No.  So I don't

9 know that.

10        But there is certainly collaboration between

11 our ENT department at Mayo Clinic and the GI department

12 enough that they have written a paper together on the

13 topic.

14 Q.        And has your department where you were trained

15 ever published anything saying don't use prophylactic

16 antibiotics for this surgery?

17 A.        I don't recall any specific papers from that

18 department addressing antibiotic usage.

19        But, again, the faculty in our department has

20 collaborated with those two GI surgeons on a paper

21 regarding Zenker's diverticulum.

22 Q.        Can you -- are you going to bring as a witness

23 any academic person from any department that does not

24 teach their residents to use prophylactic antibiotics

25 for this surgery?

1    A.        I can't answer that.

2    Q.        Could you find anything in a witness in

3    Tennessee or a contiguous study that says, I'm in an

4    academic department and I train residents that they

5    don't need to use it or don't use it?

6    A.        I was not involved with any of the collection

7    of the expert witnesses.  I can -- I can say from paper,

8    other papers that have been published in the literature,

9    there are papers out there that say there is no need for

10   prophylactic antibiotics.

11             Some of those are review studies.  A review

12   study is where they collect multiple studies and then

13   come up with general recommendations based on multiple

14   studies.  Sometimes call those meta-analysis.  And so

15   there is meta-analysis studies looking at Zenker's

16   diverticulum, and in some of those studies, they do not

17   recommend prophylactic antibiotics for this surgery.

18   Q.        Do those articles deal with HARMONIC® scalpel

19   division?

20   A.        Yes.

21   Q.        And you can find those and deliver them and

22   they will be from the ENT departments; is that correct?

23   A.        That is correct.

24   Q.        Okay.  Do you think this surgery, your surgery,

25   caused this perforation?

1  A.      Well, it was caused during the surgery.  So

2  something happened during the surgery that likely caused

3  it.  Can I say what?  I cannot.

4  Q.      Do you remember being asked that question in

5  your deposition, And do you think your surgery caused

6  that, the perforation we were talking about?  Answer, I

7  don't know what caused it.  It would be speculation.

8  Did you give that testimony?

9  A.      That sounds like a reasonable answer.  I think

10 I'm giving the same answer right now.  I don't know what

11 actually caused it.

12 Q.      Well, let me ask you about the next question

13 and answer and then tell me if that's reasonable.  Do

14 you think it caused it?  Answer, no.

15        Do you remember testifying that you did not

16 think your surgery caused this perforation?

17 A.      I do not recall that.

18 Q.      All right.  I'm going to show you page 18 of

19 your deposition.  We were talking about the surgery and

20 what caused it, and you said it was iatrogenic, meaning

21 no known cause.  And do you think your surgery caused

22 that?  Answer, I don't know what caused it.  It would be

23 speculation.  Do you think you caused it?  Answer, no.

24        Did you give that testimony?

25 A.      Yeah.  Continue on.  You know, What do you

1  think caused it?  I think a combination of factors.

2  One, nutritional status, poor wound healing, thermal

3  damage, which are all things that we discussed today.

4  Q.      All right.  So you think it was a combination

5  of factors.  One, her poor nutritional status.  So

6  poor -- so that would cause, you're saying, poor wound

7  healing, more likely than not, or it could be thermal

8  damage from the device.  What device?  From the

9  HARMONIC® scalpel.

10          Is that your testimony?

11 A.      That's the testimony.

12 Q.      Do you still believe that?

13 A.      I believe we don't know the exact cause of what

14 caused it.  It could be any of those factors which I was

15 trying to describe there.  So all you know is there is a

16 hole afterwards.  Whether it was a thermal damage from

17 the HARMONIC® scalpel, whether it was from poor wound

18 healing, there is no way of knowing the exact cause of

19 why the perforation occurred.

20 Q.      Okay.  Let's go back to your report.

21          MR. JONES:  Take that large one off.

22          All right.  Let's go to the next page.

23 BY MR. JONES:

24 Q.      Marilyn Foster is a pleasant 69-year-old

25 female.

1      First of all, let me ask about that.  Was she a

2  pleasant patient?

3  A.      She was.

4  Q.      Was she cooperative in every way with you?

5  A.      She was.

6  Q.      Was her daughter who you dealt with, was she

7  nice?

8  A.      As far as I remember.

9  Q.      Did these people seem reasonable and compliant

10 in trying to get well, the mother?

11 A.      At the time, yes.

12 Q.      Okay.  Well, that was the only time you had her

13 as a patient; is that correct?

14 A.      Well, you're asking a question retrospectively

15 after we have time to review all of these medical

16 records, and so retrospectively looking at it, you know,

17 we talked about her originally seeing an ENT in 2015,

18 where the surgery was recommended, and then she saw

19 Dr. Catherine Vinson again in 2017, and had the surgery

20 scheduled and rescheduled multiple times, had seen

21 Dr. Rayne in Cookeville, and then came to me.

22      And so in terms of, you know, being -- I'm

23 trying to remember the phrasing you used for -- you

24 know, that you used, but, you know, obviously they had

25 not aggressively tried to get it done right away.  I

1  mean, it took them -- you know, from the time of the

2  diagnosis in 2014, until they came to me, that was four

3  years from the time of diagnosis until the time of

4  treatment.

5  Q.      And does that make them unreasonable in your

6  opinion?

7  A.      No, no.  It just means that, you know,

8  they -- it took a long time to get to the point of

9  actually having surgery, even though she indicated she

10  wanted the surgery four years before that.

11  Q.      Well, you knew when you saw her as a patient

12  that she had been to Vanderbilt and that this surgery

13  had been previously recommended; not this surgery, but a

14  form of Zenker's diverticulum surgery?

15  A.      Well, it was a similar surgery, just different

16  tools.

17  Q.      And their tools were going to be the microscope

18  and not what you used?

19  A.      Well, it would be the laser.

20  Q.      The laser microscope, isn't that what it's

21  called?  $CO_2$ laser?

22  A.      They used a microscope.  It has actually a

23  micromanipulator device that you attach to it.

24  Q.      I'm just asking you if she was a pleasant --

25  A.      She was.

1    Q.         -- and a reasonable person?

2    A.         She was.

3    Q.         Who, when she communicated to you, communicated

4    what symptoms, it would be based on what you actually

5    saw?

6    A.         She was.  I mean, I see from my notes from

7    2015, until my history, that she communicated those

8    findings very similarly.

9              MR. JONES:  Okay.  And then let's go on down

10   here.  If you can take this off.  We'll just go down.  I

11   can read it and then pull it up where we need it.

12             All right.  Let's go down to surgical details.

13   BY MR. JONES:

14   Q.         The patient was brought to the operating

15   room -- this is the second surgery -- and transferred to

16   the operating table in the supine position.  What is

17   that?

18   A.         On a person's back is what supine means.

19   Q.         General endotracheal anesthesia was initiated

20   with the GlideScope and the patient was intubated.

21             All right.  So in the trachea, which is right

22   next to the esophagus, there was anesthesia going down

23   to the lungs; is that right?

24   A.         That is correct.

25   Q.         Okay.  There was no significant vocal cord

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  edema, which that means swelling; is that right?

2  A.       That is correct.

3  Q.       There was significant postcricoid edema.  Where

4  is the postcricoid space?

5  A.       The cricoid is the area just in front of the

6  opening to the esophagus.  It would be behind the vocal

7  cords.

8  Q.       And is it part of the retrophar- -- is it part

9  of the pharyngeal tissue?

10  A.       It is.  Well, it would be in front of the

11  pharyngeal tissue.  The pharyngeal tissue is at the back

12  of your throat.  There is a little separation between

13  your voice box or larynx.  So it would be the backside

14  of the larynx.  Without pictures, it's a little hard to

15  describe.

16          But the back of your throat is here

17  (indicating).  The front of your larynx and vocal cords

18  are here (indicating), and then the beginning of the

19  esophagus, and that muscle is here (indicating) --

20  Q.       How far --

21  A.       -- right in front of it.

22  Q.       How far was that away from the Zenker's

23  perforation that you found?

24  A.       Could you repeat that?  I just couldn't hear

25  it.

1  Q.        In centimeters, about how far in distance would

2  this swelling be from where the hole is?

3  A.        Maybe three centimeters.

4  Q.        Why was that tissue swollen at the time of the

5  second surgery?

6  A.        I can't answer that.  All I can say is:  I'd

7  have to look and see what findings we see.

8  Q.        When you saw them, did you think this is a sign

9  of a probable infection?

10  A.        Well, it's inflammation.  It's not necessarily

11  a sign of infection.  Inflammation doesn't always equal

12  infection.

13  Q.        Okay.  Inflammation is something that will

14  follow something not -- or something bad, and it was a

15  regular follower of infection; is that correct?

16  A.        It's not a regular follower.  I see swelling of

17  the vocal cords all the time and they're not infected.

18  Q.        But when you see one that's infected, it's

19  usually swollen; is that correct?

20  A.        That's usually true.

21  Q.        Okay.  Once the patient was anesthetized, we

22  performed a rigid surgical -- a rigid cervical

23  endo- -- say that word for me.

24  A.        Esophagoscopy.

25  Q.        Trying to identify the esophageal lumen.  Why

1  did you want to identify the esophageal lumen?

2  A.          Well, I mean, that's part of identifying your

3  landmarks for surgery.

4  Q.          Because you wanted -- once you found that, you

5  wanted to work down towards where the hole was; is that

6  what you were --

7  A.          Sure, you want to see the anatomy.

8  Q.          Due to the significant postsurgical swelling in

9  the postcricoid space, this could not be completed.

10          Now, in layman's terms, does this mean that the

11  tissue where you were trying to put these instruments

12  down to look down her throat, that was so swollen, so

13  inflamed that you couldn't -- you couldn't fit the

14  instrument in it; you couldn't get it to pass?

15  A.          It's very likely.  Dr. Bunge did that portion

16  of the procedure.  So I can't comment on exactly what

17  was seen.

18  Q.          Were you standing right beside him?

19  A.          I was, but you can't -- with a rigid endoscope,

20  you have about this much view (indicating), and so, no,

21  two ENTs can't look through a rigid endoscope at the

22  same time.

23  Q.          But what you understood as somebody taking part

24  in that surgery that you wanted, both of you, to get

25  that scope down and it wouldn't pass because the tissue

1  was so swollen; that was your understanding?

2  A.        Correct.  It was swollen back there, correct.

3  Q.        We then positioned the patient for an external

4  approach.  Does this mean you put her on her side?  How

5  did you position her so you could cut through the neck

6  in an external approach?

7  A.        Turning the bed, turning the head.  You know,

8  we're approaching on the left side, so you're turning

9  the head to the right.

10  Q.        And you were doing this in preparation for

11  cutting a hole in the side of her neck; is that right?

12  A.        So we make an incision in the side of the neck.

13  Q.        To cut into the side of the neck to get inside

14  the neck --

15  A.        Correct.

16  Q.        -- through this incision?

17          I marked a three-centimeter horizontal line --

18  or he says, I marked a three-centimeter horizontal line

19  in a skin crease in the neck two finger breadths above

20  the palpated cricoid cartilage.

21          Can you show us on your neck where that would

22  have been?

23  A.        Well, your Adam's Apple is your thyroid

24  cartilage.  The cricoid cartilage, if you feel down, you

25  can kind of feel that first ring in your windpipe just

1   below it.  That's your cricoid cartilage.  So two finger
2   breadths would be putting it on there and going a little
3   bit above that.
4   Q.        Okay.  And so, again, on your neck, show us
5   where you made this hole, you made this incision.
6   A.        The incision?  Approximately here (indicating).
7   Q.        What did you do next?
8   A.        Well, we injected it with the -- it's called
9   lidocaine with epinephrine.  It's a numbing medication.
10  Also shrinks the blood vessels so you have less
11  bleeding.
12            You wait for that to take effect.  It takes
13  five to ten minutes to allow that to take effect.
14            Do you want me to keep reading the operative
15  report?
16  Q.        This took time to get effect.  Then you say an
17  incision was made through the skin and subcutaneous
18  tissue down to the -- what's that term?
19  A.         It's called a platysma.  It's that muscle in
20  your neck.  If you clench it, it runs from your jaw bone
21  down to your clavicle.  If you tension it, you can it
22  tighten up.  Some people have a thin muscle; some have a
23  thicker muscle.
24            MR. JONES:  Your Honor, may I pass an
25  anatomical drawing to the witness?

1          THE COURT:  Is this an exhibit?  What is this?

2          MR. JONES:  It's an exhibit, but I want him to

3  mark on this himself so we can make this a finalized

4  marked copy.

5          MR. GIDEON:  If this is one of the Netter

6  plates, there are no objections.

7          MR. JONES:  May I approach the clerk?

8          THE COURT:  Yes, so --

9          MR. GIDEON:  Do you want --

10          THE COURT:  I'm sorry?

11          MR. GIDEON:  Do you want a set to look at, too?

12          THE COURT:  Yes, actually, I would.  Are you

13  going to put that on the overhead or --

14          MR. JONES:  Yes, I was, but if --

15          THE COURT:  If you've got an extra copy, that

16  would be great.

17          MR. GIDEON:  I thought you might want to look

18  at it.

19          THE COURT:  Thank you.

20          MR. JONES:  Forgive me, sir.  Can the overhead

21  pick up what he's marking as he marks it?  I had no

22  idea.  I'm sorry.

23          MR. CALLAHAN:  No, it can't.

24          MR. JONES:  He's got to mark it first.

25          MR. GIDEON:  This is a subset, Your Honor, from

1  the Netter anatomic book.  You should have them in

2  sequence.

3         THE COURT:  Thank you.

4         MR. GIDEON:  Sure.  Can I just inquire what the

5  protocol is?  Is he going to mark it and then put it up?

6         THE COURT:  That's my understanding.

7         MR. GIDEON:  Are we looking at fascial

8  expression lateral view?

9         MR. JONES:  What I'm going to have him do is

10 mark several things at the same time.  But I'll do it

11 however you want me to.  Whatever you think is helpful.

12        MR. GIDEON:  I just wanted to know what you're

13 going to do.

14        THE COURT:  That's fine.  He's going to mark it

15 in response to your questions and then he's going to

16 place it on the overhead and show it to the jury.

17        MR. JONES:  That's correct.

18 BY MR. JONES:

19 Q.     If you would, the first mark that you put on

20 there -- have you already put a mark on it?

21 A.     No.

22 Q.     Okay.  The first mark you put on it, mark where

23 the incision was on here, and then explain and put a

24 line out and say "incision".

25 A.     I'm sorry.  The pen doesn't work real well,

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  but --

2  Q.      All right.  Have you marked it?

3  A.      I have.

4  Q.      Okay.

5          MR. JONES:  Your Honor, I apologize for what I

6  told the Court, but Mr. Callahan tells me I'm doing it

7  wrong and that I should get each of the markings on a

8  separate exhibit.  So I'm going to follow his advice

9  with the Court's permission.

10         THE COURT:  Sure.  And so are you going to

11 enter these as a collective exhibit or each marked as an

12 individual exhibit?

13         MR. JONES:  Each as a separate one.

14         THE COURT:  I assume you have no objection to

15 that.

16         MR. GIDEON:  No, no objection.

17         THE COURT:  All right.  So ordered.  Let's move

18 on.

19         MR. JONES:  I'm sorry.

20         THE COURT:  Thank you.

21         THE WITNESS:  Could I get a different pen if

22 I'm going to be writing?  This doesn't come through very

23 well.

24         THE COURTROOM DEPUTY:  I'll see if I can find

25 one for you.

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  BY MR. JONES:

2  Q.      All right.  Sir, in this red tissue area

3  (indicating), is that a muscle?

4  A.      It is.  I can't see where you're pointing to,

5  but it's the main muscle that is on that picture.

6  Q.      And is that the platysma?

7  A.      That's the platysma.

8  Q.      Okay.  And so you made this incision --

9          MR. JONES:  I better make this an exhibit.

10         THE COURT:  So ordered without objection.

11         THE COURTROOM DEPUTY:  Your next number is 21

12  if this has not previously been provided.

13         MR. JONES:  It has not.

14         THE COURTROOM DEPUTY:  Yeah.

15         (Plaintiff's Exhibit 21 was marked for

16          identification.)

17         MR. CALLAHAN:  Can you switch from the

18  overhead?

19  BY MR. JONES:

20  Q.      The platysma was divided and small subplatysmal

21  flaps were raised high and low, superiorly and

22  inferiorly.  What does that mean?

23  A.      Really, just what you described.  I mean, we

24  just elevate the tissue underneath that muscle to give

25  us more space to work.

1    Q.      Okay.  Let's go further down.

2           Blunt dissection was carried down to the

3    sternohyoid strap muscle and this was dissected further.

4           On the next document, next --

5           MR. CALLAHAN:  This is plate No. 22.

6           Your Honor, at the bottom of the right corner,

7    there is the numbers.  This is plate 22.

8           MR. JONES:  Okay.  This is plate 22.  I'm going

9    to pass that to the witness.

10   BY MR. JONES:

11   Q.      All right.  If you would mark where the hyoid

12   strap muscle was and mark it where it was dissected

13   free.

14           Have you done that?

15   A.      Yes.

16           MR. CALLAHAN:  Let's see what he did.

17   BY THE WITNESS:

18   A.      I think in response to -- you can't really -- I

19   mean, you can just show where the muscle is.  You can't

20   really -- it's a static image.  You really can't show

21   where it's dissected free.  That's just pointing to

22   where the arrow is, the sternohyoid muscle.

23           THE COURT:  You want to move that into

24   evidence?

25           MR. JONES:  Sir?

1          THE COURT:  Do you want that into evidence?

2          MR. JONES:  I do.

3          THE COURT:  All right.

4          MR. JONES:  I do.

5          THE COURT:  So ordered without objection.

6          MR. CALLAHAN:  Hand it to her.  It's an

7    exhibit.

8          Let's go back to the op note.

9          MR. JONES:  Back to the op note.  Bring it on

10   down.

11   BY THE WITNESS:

12   A.       And dissected free doesn't mean that we cut it.

13   We just moved it out of the way of the other tissue.

14   BY MR. JONES:

15   Q.       That is attached to something, isn't it?

16   A.       Correct.  But we're not freeing it from its

17   attachment.  You're just moving it out of the way so you

18   can get to the tissue deep to that.

19          So to give you a better understanding of what

20   we're doing, we're moving the tissue away.  We're not

21   cutting it free.

22   Q.       And when you finish the procedure, it just goes

23   back in its place?

24   A.       It just go back in its place.

25   Q.       Using blunt dissection with peanuts, we

 1  dissected through the constrictor muscles.

 2          What are peanuts?

 3  A.      Peanuts are almost like a cotton -- a cotton

 4  ball.  You can just use it to push tissue side to side.

 5  So you're not actually cutting anything; you're just

 6  separating it.

 7          Most of the tissue is separated by these --

 8  what we call fascial planes, and so there is natural

 9  dissection planes where you can separate muscle.

10  Q.      And it's soft; isn't that correct?

11  A.      Yes, it's relatively soft.

12  Q.      So when you use this relatively soft device to

13  kind of push the tissue apart, something happened.

14  Explain that.  What happened?

15  A.      Well, the tissue separates.  I mean, you're

16  using the pressure of your hand against the cotton

17  peanut to separate the tissue, and you have retractors

18  to keep it retracted back, and so you go to the next

19  layer and you keep going down.  So you're dissecting,

20  bluntly dissecting the tissues.  That means you're not

21  making cuts.  You're not using any cautery device to cut

22  the tissue.  You're just separating the tissue planes

23  and then retracting the tissue and the muscles back.

24  Q.      And then you have this statement:  The tissue

25  was extremely friable.  Is that correct?

1  A.        Well, that's a correct statement there.  I

2  wasn't meaning the hyoid muscle was.  It means when we

3  got down to the constrictor muscles.

4  Q.        Well, were the constrictor muscles the tissue

5  that was extremely friable?

6  A.        Correct.  I mean, that's part of the process of

7  why people get the diverticulum to begin with.

8          As we'll show on some pictures, there is a

9  triangle called Killian's triangle, which the triangle

10 is made up of that cricopharyngeal muscle, which is that

11 tight, bandlike muscle.  And then the muscle above it is

12 what we call your inferior constrictor muscle.  That

13 would be the back muscle of your pharynx.  And there is

14 a triangular weakness there called Killian's triangle,

15 that's to describe it, and that's where the diverticulum

16 pooches out.

17         So, by nature, that pharyngeal tissue, those

18 constrictor muscles where it's being pushed through is

19 more friable.

20 Q.        And was it so friable -- the muscles

21 themselves, were they so friable as you tried to push

22 through them with a soft instrument, they just -- they

23 just opened up; you just had a new hole?

24 A.        Well, the muscles didn't tear.  Again, you're

25 separating muscle fibers.

1  Q.        Whether it's a tear or however you call this

2  separation of muscle fibers, using this little

3  instrument, the soft instrument, and using it carefully,

4  the tissue couldn't take it and it broke apart and you

5  had a new hole; is that correct?

6  A.        We didn't have a new hole.

7  Q.        Well, what was this -- what was this opening

8  you said?

9  A.        Well, it's an opening.  When you separate

10  tissue, you're going to have an opening.

11  Q.        All right.  An opening into what?

12  A.        Into the pharyngeal soft tissue.  So that's

13  what that pharyngeal soft tissue is.  So there is a

14  layer.  You have your constrictor muscles.  And on the

15  inside of that is the mucosa.  And underneath mucosa,

16  you have fat or mucosal tissue, and that's what's

17  actually pooching through the muscle were these

18  diverticulums.

19        And so when you separate the muscles, you're

20  making an opening through the muscle to get to that

21  pharyngeal tissue.  I didn't say I made a hole

22  into -- you know, it doesn't say I made a hole into the

23  pharynx, which would be a different description.

24  Q.        Well, from the outside of the body going

25  through the way you all had come in, was there now an

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  opening into the esophagus or into the pharynx or into

2  the --

3  A.      Well, there was not an opening into the pharynx

4  or the esophagus.  There was an opening through the

5  constrictor muscles to the pharyngeal soft tissue.

6          So going from outside to inside, you're going

7  to have constrictor muscles.  Then you're going to get

8  to the pharyngeal soft tissues.

9  Q.      All right.

10  A.      Then you're going to get into the back of the

11  pharynx which is space.

12          MR. JONES:  All right.  I'd like to pass

13  another exhibit.

14          MR. CALLAHAN:  This is No. 62.

15          MR. JONES:  And I'd like to make the last one

16  an exhibit.

17          THE COURTROOM DEPUTY:  So that would be No. 23.

18          THE COURT:  Which one is this?

19          MR. CALLAHAN:  This is plate No. 62, Your

20  Honor.

21          THE COURT:  Thank you.

22          MR. GIDEON:  62?

23          MR. CALLAHAN:  Yes.

24          (Plaintiff's Exhibit 23 was marked for

25           identification.)

1  BY MR. JONES:

2  Q.      What I'd like for you to mark is where that

3  opening in the pharyngeal soft tissue was created.

4          Have you marked that?

5          MR. JONES:  Can the jury see that now?

6          MR. CALLAHAN:  You have to make it an exhibit.

7          MR. JONES:  I thought I did.  We'd like to make

8  that an exhibit, Your Honor.

9          THE COURT:  So ordered without objection.

10          (Plaintiff's Exhibit 23 was received into

11           evidence.)

12  BY MR. JONES:

13  Q.      Where you have made this arrow, that's where

14  you created this hole; is that correct?

15  A.      An opening in the pharyngeal -- yeah, in the

16  muscle.  And that's where we found the Zenker's

17  diverticulum.  And that's the immediate next statement

18  in the procedure note.

19  Q.      Okay.  The Zenker's diverticulum would be

20  coming toward where the camera would be if it was taking

21  a picture, this picture; is that right?

22  A.      It would be coming posterior and out

23  into -- out of the screen because they typically go off

24  to the left side just because your spine is behind it.

25          Your esophagus generally sits just a little bit

1  to the left of your trachea, and so most Zenker's

2  diverticulums will go off to the left side just by

3  nature of the anatomy.

4          So if you're looking at this picture, coming a

5  little bit out of the screen and into the white area.

6  Q.      All right.  In this note, as we're going to go

7  down, it says that you used constrictor muscles, plural,

8  to overcome -- to overlay and support the closing of the

9  opening that you made; is that correct?

10 A.      Correct.

11 Q.      And where did you get those from?

12 A.      Well, it would be almost -- this picture

13 doesn't really -- you can't see it here, but when you

14 get that outpouching, there is going to be a space where

15 that arrow is.  And so we suture the interior aspect of

16 those -- of that constrictor muscle, and like I said, it

17 makes more of, like, a triangle.  So once you've taken

18 out that pocket, yeah, there is a space created there.

19         And so this picture shows it more like going

20 across like this (indicating), but there is more of a

21 triangular area that you can partly close, and that's

22 the constrictor muscle that was then closed.

23         MR. JONES:  May I pass another one?

24         MR. CALLAHAN:  This will be plate No. 222, and

25 I believe the last one in these series, so the Court

1  knows.  222.

2  BY MR. JONES:

3  Q.      Sir, I need to ask you one technical question.

4  Are these Netter plates anatomically correct and

5  reliable?  I know it's not seeing it in flesh, but are

6  these anatomical plates that you've been talking about,

7  are they anatomically correct?

8  A.      They are.

9  Q.      Go ahead.  Okay.  Now, on this one, can you

10 show us and mark where the constrictor muscles were that

11 you used to support the closing that you described as

12 making in the second surgery?

13         MR. JONES:  May we admit this, Your Honor?

14         THE COURT:  Yes, without objection.

15         MR. CALLAHAN:  Make sure she gets this one

16 back.

17         THE COURTROOM DEPUTY:  I'll get them at the

18 break.

19 BY MR. JONES:

20 Q.      All right.  Sir, on the previous one where

21 you've done this circle (indicating), how did you get

22 those constrictor muscles to the place that you needed

23 to get it to to reinforce the covering for the hole?

24 A.      I'm not understanding the question you're

25 asking.

1  Q.      Okay.  How did you get these constrictor

2  muscles that are located in that -- inside of that

3  circle you made to the place you needed them to be to

4  cover the hole that -- the covering that you put over

5  the hole?

6  A.      Well, we used sutures to close those muscles.

7  Is that what you're trying to ask?

8  Q.      No, no, the sutures would be how you did it.

9  Did you have to mobilize them?  Did you mobilize these

10 constrictors?

11 A.      Well, that's what you're doing when you're

12 suturing something closed is you're bringing the tissue

13 together.  So, again, this is not an accurate

14 representation; this is normal anatomy and not anatomy

15 of a Zenker's diverticulum.  So where it shows almost,

16 really, no space there, you know, the pouch is pooching

17 through.

18        By nature -- and there is three main reasons

19 why -- theories of why people have -- why people get

20 this Zenker's diverticulum, and to understand Mr. Jones'

21 question, you have to understand kind of how these

22 develop.

23        There is one theory that that muscle is too

24 tight, meaning scar tissue.  There is another theory

25 that it has too much tonic contraction.  There is

1  another theory that the mucosa in front of it is weak.

2  There is a theory that the coordination of all that is

3  not timed well, and so when you try to push the food

4  down and it's not timed well and the muscle doesn't

5  relax and open allowing the food to go down, that

6  creates kind of what we call propulsion diverticulum.

7          And so by nature, that whole pharyngeal tissue

8  is weak.  And so, again, when it pooches out, you almost

9  have this triangular area, and it's more lax than a

10  person's normal anatomy, and so it's easier to mobilize

11  it and close it.

12  Q.      Okay.  Okay.  What I was trying to find out is

13  what you did with this tissue.  Did you put stitches in

14  it?

15  A.      Yeah, I said we put stitches in it to bring

16  that tissue together.

17  Q.      Okay.  So you stitched these muscle fibers in

18  various places, and you stitched them together and you

19  put -- so now they're working in kind of a net, a

20  stitched net; is that correct?

21  A.      If that's how you want to describe it.  I mean,

22  they're stitched together.

23  Q.      And before you got there and were stitching and

24  maneuvering these -- these muscles, what was the job of

25  these muscles?

1  A.     Well, the normal job of those muscles is to

2  constrict.  That's why they're called constrictors.  And

3  they help push the food down.

4  Q.     Okay.  So they were muscles that were necessary

5  and useful for the swallowing mechanism; is that

6  correct?

7  A.     Correct.  And that's what I was trying to

8  mention before.  Part of the reason why people get some

9  of these difficulties swallowing, it's thought that

10 those pharyngeal muscles can be weak or become weak over

11 time as a result of the chronically trying to squeeze

12 food down through a cricopharyngeal muscle -- that's

13 that CP muscle -- that's too tight or it's not relaxing

14 in coordination with that constrictor muscle squeezing.

15 Q.     Okay.  But your decision to do this closure and

16 reinforce it with these muscles changed somewhat the

17 natural orientation and operation of these muscles; is

18 that correct?

19 A.     Well, they're already abnormal to begin with.

20 Q.     Well, however they were abnormal to begin with,

21 they were in a different state of abnormality after you

22 did the second procedure; is that right?

23 A.     Well, you'd almost say they're more in their

24 natural position because we were bringing it back to

25 look more like the picture here, as opposed to where you

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  have that big outpouching where that sac is getting

2  pooched through.  And that makes an opening.  That's how

3  the food gets in there.  And so by bringing those

4  muscles back together and reinforcing it, you're

5  actually creating it more back to a person's normal

6  anatomy once you've taken that sac out, closed the

7  mucosa, and then reinforced it with the muscle

8  afterwards.

9          It was also providing another barrier for

10  reinforcement against her swallowing because even after

11  we're done with the procedure, you know, you swallow

12  about 600 times a day, and so every time you swallow,

13  that force is going against the mucosal lining that we

14  closed.  So in reinforcing it with the constrictor

15  muscle actually gives you more back-to-normal anatomy

16  where you can resist that force of another outpouching.

17  Q.      Well, ultimately this whole thing you did with

18  the constrictor muscles and with the diverticulum

19  pouching underneath it, that all broke down, didn't it?

20  A.      It did.

21          THE COURT:  Okay.  Mr. Jones, how much more

22  direct do you have?

23          MR. JONES:  About 30 more minutes to 45.

24          THE COURT:  Okay.  Well, let's take our

25  afternoon restroom break for everyone.  It's 3:15 right

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1   now.  So let's take about 15 minutes.  We'll come back

2   at 3:30.  All right?

3            THE COURTROOM DEPUTY:  All rise.

4            This honorable court is now in recess.

5            (A brief recess was taken.)

6            THE COURTROOM DEPUTY:  All rise.

7            This honorable court is now in session.  Please

8   come to order and be seated.

9            THE COURT:  Okay.  Are we ready for the jury,

10  Mr. Jones?

11           MR. JONES:  Yes, sir.

12           THE COURT:  All right.  Very good.  Ms. Laster.

13           (Whereupon the following report of

14            proceedings was had within the presence

15            and hearing of the jury:)

16           THE COURT:  Have a seat when you're ready.

17           Okay.  Let's see if we've got everybody.

18           All right.  Mr. Jones, when you're ready.

19           MR. JONES:  Yes, sir.

20  BY MR. JONES:

21  Q.       Sir, as I understand your testimony, there was

22  only one opening in the esophagus or the sac, and that

23  was the one that opened following your first surgery; is

24  that correct?

25  A.       Correct.

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  Q.      Let me read you Dr. Bunge's deposition and ask

2  you about that.

3          And her tissue was just so weak that in doing

4  so -- he's talking about using the sector.

5          MR. GIDEON:  I have an objection.

6          THE COURT:  Yes, sir, what's your objection?

7          MR. GIDEON:  Improper use of another deposition

8  to interrogate a witness.  This is something we talked

9  about at the pretrial conference.

10          MR. JONES:  Your Honor, these are partners, and

11  I think I can ask him about what his partner and person

12  who was there with him says about the testimony.

13          THE COURT:  Why?

14          MR. JONES:  To show the difference in the

15  testimony between the two partners.

16          THE COURT:  How is that admissible?

17          MR. JONES:  Sir?

18          Okay.  Can I ask him -- let me change my

19  question and make it whether he's aware of it.

20          THE COURT:  You can ask him that.

21          MR. JONES:  Okay.

22          THE COURT:  What's your -- do you have

23  something?

24          MR. GIDEON:  No, I just wanted to make sure my

25  last objection was sustained.

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1    THE COURT:  It's sustained, yes.  It's

2  sustained.

3    MR. GIDEON:  Thank you.

4  BY MR. JONES:

5  Q.    Are you aware of what Dr. Bunge has testified

6  about that second surgery and whether a second hole was

7  made?

8  A.    I do not recall.

9  Q.    Okay.  Doctor, did the infection that you found

10  in the mediastinum in the second surgery, did that

11  change the tissue in the pharynx?

12  A.    I don't believe it did.

13  Q.    Have you ever thought differently?

14  A.    No.

15  Q.    Well, what do you think the infection that you

16  found and the sepsis that you found did to your patient?

17  A.    Well, remember, the infection was down in the

18  mediastinum.  If we -- if we continue reading the

19  operative note, it mentions we separated the pharyngeal

20  and esophageal soft tissue from the spine, and then we

21  encountered copious amount of purulent drainage in the

22  mediastinum.

23    So I didn't mention any copious amount of

24  purulent drainage prior to that.  So it was in the

25  mediastinum where all that purulent drainage was.

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1    Q.       And so the infection was not down into

2    the -- into the -- was not in the retropharynx; is that

3    correct?

4    A.       Well, there is what's called a retropharyngeal

5    space.  Like I was trying to explain before, the

6    retropharynx starts behind the pharynx, and it's

7    normally not even a space.  They're called potential

8    spaces.  They're called danger spaces because they can

9    track from that area all the way down in the

10   mediastinum.

11            So, you know, a side effect of tonsillitis is

12   it can rupture through that pharyngeal tissue, get into

13   that danger space, and you can get a mediastinal abscess

14   in that space.  And so that saliva most likely separated

15   that space, tracked down into the mediastinum, and that

16   fluid collection was sitting down in the mediastinum and

17   that created the infection.

18            And so there is a continuum there.  So the

19   retropharyngeal space continues all the way down into

20   the mediastinum.

21   Q.       And does -- does it continue up from the place

22   you started your surgery when you went in from the

23   outside?

24   A.       Repeat that question again.

25   Q.       Sure.  When you went in, when you cut in the

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  left side of her neck, did you encounter -- once you got

2  the big muscle coverings out of the way, did you

3  immediately encounter friable tissue?

4  A.      Well, again, like I said before, the

5  diverticulum, the whole pharyngeal area is relatively

6  friable by nature. That area was not infected. So we

7  didn't encounter pus initially. It was when we started

8  moving the esophagus off the spine that we opened up

9  that potential space and we started seeing the pus.

10  Q.      And how long after you started this dissection

11  did the tissue just basically fall apart and you had

12  this new hole made? When did the peanuts make the new

13  hole? How long had you been doing that surgery?

14  A.      Well, there wasn't necessarily -- there was an

15  opening in the pharyngeal tissue. It wasn't necessarily

16  a hole. We covered that before. I don't have a time.

17  Q.      I'm not asking so much in minutes, but where

18  was it? Was it -- was it soon after you got your

19  initial incision made?

20  A.      I mean, we went over the steps there 15,

21  20 minutes into the surgery. I mean, it's all laid out

22  sequentially there pretty well.

23  Q.      Well, where you found the infection, how did

24  that change her tissue?

25  A.      How did it change the tissue, the infection?

1  Q.       How did the infection you found change her

2  tissue?

3  A.       Well, infections in general can lead to sepsis.

4  That's a generalized infection all over the body.  So

5  that can change all your tissues in your body.  We knew

6  that because we had gotten a procalcitonin, which is a

7  lab that Mr. Gideon mentioned in his opening.  A

8  procalcitonin level gives us an idea that sepsis is more

9  likely.  The higher the level, the more severe the

10 potential risk of infection.

11        And so, in general, any time you have potential

12 sepsis, you're going to get inflammation all over your

13 body.  But particularly at the site where the saliva was

14 leaking, where we saw the hole, I don't know that that

15 was any more friable than any Zenker's diverticulum

16 would be.  It was saliva, again, going through that hole

17 in the mediastinum and that's where the pus was.  We

18 didn't encounter pus at the site of the diverticulum.

19 Q.       What's your understanding of Mrs. Foster's

20 clinical course following the second surgery?

21 A.       While she was at Methodist Hospital still or

22 after she left Methodist Hospital?

23 Q.       Both.  Let's start with Methodist Hospital.

24 A.       Well, immediately after surgery, we put two

25 drains in place; one was down in the mediastinum.  That

1 thoracic surgery was following.  That's what we call a

2 suction drain.  And you have a little bowl that holds

3 suction, and the suction of that bowl pulls fluid out of

4 the chest.  So if any additional fluid would form in the

5 mediastinum, it would get pulled out.

6        We also placed what's called a Penrose drain,

7 which is really just a -- really, a piece of rubber with

8 a hole in it.  That's called a passive drain.  And that

9 was placed a little bit higher in the mediastinum and it

10 came out the neck.

11       The purpose for leaving that in, if there is

12 any additional drainage coming out there, if it would

13 have broke down, you would have a potential site where

14 that would come out of the neck as opposed to collecting

15 in the chest again.

16       So thoracic surgery followed her for several

17 days until that drain was out of the chest, and they

18 pulled that drain.  You know, within a day or two, her

19 white blood cell count that was around 28,000 had come

20 down.  Her tachycardia, which is a fast heart rate, had

21 come down.

22       She remained in the ICU intubated, I believe it

23 was until the afternoon of the next day, and that was

24 just per what we call a hospital intensivist protocol.

25 So we had consulted a hospital intensivist.  They're

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  physicians that really just take care of people in the

2  ICU, critical patients.  And he was following her, and

3  they're the ones that dictate when that breathing tube

4  was taken out.  And I believe that was taken out the

5  morning, afternoon, evening, but the following day,

6  which would have been Sunday.

7      And then she continued to progress well.  You

8  know, pain level increased (sic).  You know, we told

9  her, you know, initially, prior to going to the second

10 surgery, what to look forward to was a four-day plan.

11 Meaning, until we knew that the white blood cell count

12 had gone up and there was mediastinitis, that we were

13 typically going to wait and see if the air in the neck

14 had gone down.

15     But obviously that plan changed after the

16 second surgery.  So we knew we had to leave time for

17 that suture line where we had taken out the sac and

18 sutured it together and reinforced that muscle, you need

19 time for that to heal.

20     So we had already placed a feeding tube in her

21 nose and down the throat prior to the second surgery,

22 and that was left in place at the second surgery.  So we

23 knew we had a way of feeding her.  And we just needed to

24 give that area time to heal.

25     And that can be variable with -- you know,

1    because that open approach has been done for many years,
2    there is variable time frames when a surgeon will allow
3    that patient to start eating again.  Oftentimes it will
4    be based upon a swallow study that we get some period
5    after the surgery, and that was the plan.  We were going
6    to wait until the following Monday to do a swallow study
7    to see if there was any leak.

8          And overall she continued to progress fairly
9    well.  Pain level was very minimal.  And then we waited
10   until the following Monday to do a swallow study.

11         On that swallow study, that's when we first
12   learned that after the second surgery that there was
13   still a leak into the neck.

14         It was after that second swallow study that I
15   had a conversation with Mrs. Foster, and we talked about
16   the different options at that point.  We talked about
17   doing nothing and seeing if it would heal on its own.
18   We talked about going in and doing a surgery to try and
19   reinforce wherever it was leaking again.  She wanted
20   something done more immediately; meaning she did not
21   want to wait to let it passively heal by second
22   intention.  And that's when, you know, I talked to her
23   and she felt comfortable going to Vanderbilt.

24         And so that's when I called an ENT surgeon at
25   Vanderbilt, Dr. Langerman, and we talked and had some

1   text messages between each other.

2           He had wanted to get another CAT scan just to

3   make sure after we had done that first swallow study

4   that none of the fluid collected in the chest, and so we

5   repeated a CAT scan, and at that point, he accepted

6   transfer.

7           However, at the time there was a mass shooting

8   in Kentucky, and so Vanderbilt Hospital was kind of on

9   an overflow status.  So at that point, we were just

10  waiting until a bed opened up at Vanderbilt to transfer

11  her to Vanderbilt so they could do a surgical repair.

12          It was during that time we were waiting that

13  Alisha Collins, Mrs. Foster's daughter, came to me with

14  another ENT physician that she knew of in Richmond,

15  Virginia where she was at and requested that I call her

16  and to see if I could transfer her to Richmond,

17  Virginia.  Which I did.  I spoke to that physician.

18          I had looked up her information prior to

19  calling her.  She did not seem like an ENT that would

20  probably be appropriate, what we call a lateral level of

21  care or upper level of care; meaning she did not look

22  like she was doing a lot of head and neck surgery.  And

23  when I spoke with her, she kind of confirmed that.

24          It was at that point that I had a fellow Mayo

25  colleague that I trained with that is at VCU, Virginia

1  Commonwealth, and I reached out to her to see if there

2  was any faculty at Virginia Commonwealth that would feel

3  comfortable with this situation.

4       It was at that point I was put in touch with

5  Dr. Evan Reiter at VCU, and I discussed the case with

6  him.  They were also on an overflow situation for a few

7  days, but he was willing to accept the patient.  He

8  wanted to repeat another swallow study because it had

9  been about a week since her previous swallow study.  And

10  we repeated a second swallow study which still showed a

11  persistent leak, and it was several days after that that

12  finally a bed opened up at Virginia Commonwealth, and

13  she was transferred to Virginia Commonwealth.

14       After that, I had a few messages exchanged with

15  Dr. Evan Reiter, but I didn't have any long-term

16  communication about her care after that.

17       We did have a conversation that he did tell me

18  after they had -- she had gotten to Virginia

19  Commonwealth, they had done a repeat CT scan and had

20  suggested that the Penrose drain, which was that passive

21  drain that we had placed in there, had migrated into the

22  esophageal lumen, and his plan was to take that Penrose

23  drain out and to see if it would close up on its own.

24  And I think that was the last communication I had with

25  Dr. Reiter.

DIRECT EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  Q.      In order for the healing to take place, you had

2  to get it out; somebody had to get that out, the Penrose

3  drain, out of the esophagus, didn't they?

4  A.      Correct.  That CT scan they had done at

5  Virginia Commonwealth was the first CT scan that had

6  demonstrated that the drain may be in the esophagus.

7          She had had prior CT scans at Methodist

8  Hospital in Oak Ridge which did not demonstrate that.

9  And so it was at that point that Dr. Reiter felt that

10 that was potentially causing the hole not to close and

11 that he took the drain out, and then they followed her

12 to see if the hole had closed.

13 Q.      Doctor, did you ever intend to do a complete

14 myotomy of the CP muscle?

15 A.      During this, before the second surgery, but the

16 initial surgery --

17 Q.      I'm sorry?

18 A.      -- we did not intend to do a complete myotomy.

19          The whole philosophy between the endoscopic

20 procedure for a Zenker's diverticulum is that you're not

21 doing a complete myotomy and based upon the

22 characteristics of the diverticulum.

23          So in Mrs. Foster's case, she had a

24 two-centimeter diverticulum.  So the length of the

25 cricopharyngeal muscle is approximately four to five

CROSS-EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  centimeters.  So on a small pouch like hers, the

2  intention to begin with is not to divide the entire

3  muscle; it's only to divide that -- what we call septum

4  where the pocket is going in.

5          And so the initial surgery, we did not intend

6  to do a complete myotomy.

7  Q.      Okay.  So in the first surgery, you did not

8  expect to do a complete myotomy when you started that

9  surgery; is that correct?

10  A.      That is correct.

11  Q.      And you did not do one?

12  A.      And I did not do a complete myotomy.

13  Q.      And you never intended to completely divide the

14  CP muscle as part of that first surgery; is that

15  correct?

16  A.      That is correct.

17          MR. JONES:  That's all I have, sir.

18          THE COURT:  Thank you.

19          Any cross-examination?

20          MR. GIDEON:  Yes.

21                  CROSS-EXAMINATION

22  BY MR. GIDEON:

23  Q.      Okay.  We have two images like this.  I

24  struggle, struggle to make a picture in my own mind of

25  the retropharyngeal space, the mediastinal space.  I may

1  be the only one in the courtroom that's having trouble

2  with this three-dimensional picture, but I want the jury

3  and His Honor to have a three-dimensional picture of

4  what you're talking about.

5         You were talking about this friable tissue from

6  the diverticulum leaking into a, quote, "potential

7  space."

8         This system allows you to mark on this with

9  your finger, and if you don't get it right the first

10 time, you can erase and start again.

11        Will you do that for us?

12        Where is the retropharyngeal space that's this

13 potential space that runs into the mediastinum?

14 A.       (Indicating).

15 Q.       Okay.  Great.

16        Now, what looks like PVC pipe, that's the

17 trachea; right?

18 A.       Correct.

19 Q.       And right along the line you drew is the

20 esophagus?

21 A.       Correct.

22 Q.       Okay.  I made a representation to the jurors in

23 opening that the esophagus is collapsed.  It's like a

24 firehose that doesn't have any water in it as compared

25 to the trachea that's bony; is that accurate?

1  A.        Fairly accurate, yes.

2  Q.        Okay.  Now, next, where is the mediastinal or

3  mediastinum space?

4  A.        It's a little hard to show on here because you

5  would have to draw in, I guess, your collarbone and your

6  sternum, and the anatomy is obviously different in

7  everybody.  Somebody with a short neck, this may not be

8  a good representation, but you would say it's down, you

9  know, in this area (indicating).

10          MR. GIDEON:  Okay.  May I inquire, Judge, if

11  the jurors can see this?

12          THE COURT:  They are not.

13          MR. GIDEON:  They are not able to see this.

14          Does the Court have a solution or a

15  recommendation?

16          THE COURT:  You can move it into evidence.

17          MR. GIDEON:  I move a duplicate of this into

18  evidence then.

19          THE COURT:  All right.  Any objection?

20          MR. JONES:  No, Your Honor.

21          THE COURT:  All right.  So ordered.

22          THE COURTROOM DEPUTY:  What number?

23  BY THE WITNESS:

24  A.        I can try to point out -- I mean, I know I have

25  a --

1    MR. GIDEON:  Hold on just one second.

2    THE COURT:  What number is this?

3    MR. GIDEON:  This will be Defendants' Exhibit

4    1.

5    THE COURT:  Defendants' Exhibit 1.  So ordered.

6    (Defendants' Exhibit 1 was marked and received

7    into evidence.)

8    MR. GIDEON:  Then we'll print out a copy of

9    this.

10    THE COURTROOM DEPUTY:  I can't print from the

11    system.

12    MR. GIDEON:  Okay.  All right.  Can the jurors

13    see the animation, even though they can't see the --

14    MR. CARTER:  This is marked as our Joint 33.

15    THE COURTROOM DEPUTY:  Okay.

16    MR. GIDEON:  Can we pull this up now so they

17    can see it?

18    THE COURTROOM DEPUTY:  They're seeing it.

19    MR. CARTER:  It's been published.  She is

20    saying they can't print it for seeing it later.

21    MR. GIDEON:  Okay.  All right.  Thank you.

22    BY MR. GIDEON:

23    Q.    May I lead for a moment to establish that this

24    line down below that purple outpouching is that space

25    you were talking about?  That's the retropharyngeal

1  space, and that takes us down to this other area that's

2  the mediastinal space; correct, Doctor?

3  A.       Correct.

4  Q.       Now, in opening, I pointed out that that second

5  surgery started at 2352 in the morning on the

6  morning -- evening of the 13th and into the morning of

7  the 14th.  Was that surgery literally an emergency?

8  A.       Yes.

9  Q.       Okay.  Was that the kind of surgery, if you

10  have a mediastinal infection, that if it's not done

11  promptly and appropriately, does that patient die?

12  A.       Yes, very -- very well could be.

13  Q.       Okay.  Before then, though, you heard Mr. Jones

14  talk in opening that one of the criticisms of you was

15  that after you recognized that there was some air

16  leaking through from the crepitance in the swelling up

17  around the neck, that you should have just hold your

18  horses; don't do anything; don't take any steps?

19           MR. JONES:  Object, Your Honor.

20           THE COURT:  What's your objection?

21           MR. JONES:  First of all, he's leading, and

22  it's misstating the --

23           THE COURT:  Well, it's cross-examination.  So

24  even though it is his witness, I am going to allow him

25  to lead a little bit.

1  However, you need to ask a question.

2  MR. GIDEON:  Okay.

3  THE COURT:  So let's ask questions and solicit

4  answers.

5  MR. GIDEON:  Okay.

6  BY MR. GIDEON:

7  Q.    Was there a conservative plan initially once

8  you realized there was air leakage?

9  A.    Yes.

10  Q.    Okay.  What was -- what were the elements of

11  the conservative plan initially?  And then the second

12  question will be:  Why leave that behind and move to

13  returning Ms. Foster to the OR?  Those are the two

14  questions.

15  A.    So, to begin with, obviously when I got the

16  call and a nurse described that the neck was swollen,

17  you know, I came in right away.

18  On first examining the area, it was obvious

19  that she had what we call a subcutaneous emphysema.

20  It's a fancy term, but it basically means you get air

21  into the neck.  And it just looks -- makes you look

22  bloated because it's just lifting all the tissue up.

23  And you can feel it.  It almost feels like Rice Krispies

24  when you feel on it.  And it was fairly extensive.

25  And so at that time you just know you had an

1  air leak.  And so my plan at that time, I looked in the

2  back of her throat with a camera.  We call it a

3  laryngoscopy, where you go through the nose with the

4  camera.  We look at the back of the throat.  I had

5  documented at that time that she did have some swelling

6  in that -- what we call the postcricoid area.

7        I knew because of the air leak that we had to

8  wait for the air leak to go away before we could start

9  feeding her again.

10        So it was at that time that I placed what we

11  call a Dobhoff tube, which is just another name for a

12  feeding tube, that goes through your nose and it goes

13  down into the esophagus.  I did that under, you know,

14  examination with a laryngoscope so I knew right where it

15  was going.  We confirmed the placement of that feeding

16  tube so we know it's at the right spot in the stomach.

17        So once we established a pathway where she

18  could feed for several days, I discussed with her what's

19  been called a four-day plan to see if the air would go

20  down in the neck.  If the air would go down in the neck,

21  then potentially we would be able to let her feed and

22  get a swallow study in four days.

23        However, we were gaining -- gathering

24  information at that time.  She was tachycardic.  Her

25  heart rate was in the 120s.  We ordered a white blood

1    cell count that came back.  Her white blood cell count

2    was at 28,000.  Preoperatively -- it was slightly high

3    preoperatively.  It was like 11,000.  But a normal white

4    blood cell count would be at 10,700.  Hers was now at

5    28,000.  We had obtained the procalcitonin level, which

6    was elevated.  So it was saying she was progressing

7    towards more severe sepsis.

8         We had ordered a CAT scan, which showed

9    extensive air all over the neck into the chest.  So that

10   air was continuing to track down into her mediastinum.

11   It was starting to cause what we call a little

12   compression on the lungs, and that's where it showed the

13   fluid pocket, which they described -- I believe it was

14   about a four-millimeter fluid collection.  And the

15   radiologist called me.  I talked to the radiologist, and

16   it was at that point we knew that we had to do

17   something.  That was more of an emergency.

18        We had gotten a thoracic surgeon involved.  I

19   had already talked to the intensivist because I had her

20   moved to the intensive care unit.  When I knew that

21   there was air in the neck, I immediately moved her to a

22   higher level of care even before I got to the hospital.

23   So by the time I got to the hospital, she was already in

24   the intensive care unit.

25        I had spoken with the intensive care physician,

1  Dr. Mascioli.  And then once we gathered all that
2  information, with the fact that she was tachycardic, she
3  had the high white blood cell count, the procalcitonin
4  level was elevated, and now we know she -- knew she had
5  mediastinis -- mediastinitis, we knew we had to operate
6  to get that infection out of the chest.  And that's when
7  we consulted with Dr. Todd who was a thoracic surgeon.

8          At my training in Mayo Clinic, we are all about
9  a team approach to things.  So it's always about getting
10 physicians involved, what's going to be best for that
11 patient, and that's what we did.

12         I don't remember exactly.  Dr. Bunge was on
13 call.  I don't remember if he had just heard about it
14 and called me, if I had called him directly, but at some
15 point he knew about the events and I spoke with him.  So
16 he was more than happy to come in and help.

17         And then we planned on taking her to the
18 operating room, which we did.

19 Q.       Okay.  Next, the constrictor muscles.  When lay
20 people think about the term "patch," we think about
21 cutting something out and gluing it on or suturing it in
22 place.  Did you cut out the constrictor muscles, remove
23 them from their blood supply, and patch it over the
24 hole?

25 A.       No.

1  Q.      Okay.  You have described what you did with the

2  constrictor muscles; correct?

3  A.      Correct.

4  Q.      All right.  When you were utilizing sutures to

5  tighten the constrictor muscles, did you, to your

6  knowledge, in any way impair her ability to swallow

7  prospectively?

8  A.      No.  In fact, we had left the feeding tube in.

9  So it gives you a sense of how tight you're closing

10 everything.

11 Q.      That's the next thing I wanted to talk about.

12         Why in the world would you put a nasogastric

13 Dobhoff tube in somebody when you know there is a hole

14 somewhere in your throat; why do you do that?

15 A.      Well, one, we knew she was not going to be able

16 to feed for several days.  So, one, it provides feeding

17 access.  Two -- and that's why I did it under endoscopic

18 guidance.  So I used a flexible camera while I was

19 guiding it in there.  So you're very gentle to make sure

20 you're not potentially going into that area.  That's why

21 we had checked with an X-ray.

22         Initially I was very careful.  We had checked

23 with an X-ray to make sure that that feeding tube had

24 actually gone into the stomach.

25 Q.      Okay.  Does the feeding tube also give you

1   something like a template to know that you're not

2   closing the constrictors too tightly?

3   A.      It does.  We can -- you can actually see the

4   feeding tube through the mucosa.  As I said, I mean,

5   it's so thin you could see your finger.

6   Q.      Next thing I want to do --

7           MR. GIDEON:  If you can find me the slide that

8   shows the Bougie postoperatively, please, and then the

9   photograph, the last photograph that's taken

10  interoperatively.

11  BY MR. GIDEON:

12  Q.      I am pronouncing that correctly as Bougie?

13  A.      Bougie.  If I'm pronouncing it correctly.  I'm

14  sure it's French, probably.

15          MR. GIDEON:  All right.  Give me the last of

16  those photographs.

17          I want to make that a little bit larger.

18  BY MR. GIDEON:

19  Q.      Number one, I want to talk about standard of

20  care for an ear, nose and throat head and neck surgeon

21  practicing in Oak Ridge, Tennessee or Knoxville, or a

22  similar community in January of 2018.  Is actually

23  taking this set of photographs required by the standard

24  of care?

25  A.      No.

1    Q.      Okay.   Is it your practice to take photographs

2    of the work you do?

3    A.      I do.   I usually take lots of photographs.

4    Q.      Okay.   Is this the final photograph of the

5    original, the first Zenker's diverticulum procedure you

6    performed on Ms. Foster?

7    A.      Yes.

8    Q.      Okay.   And is this the photograph --

9            MR. GIDEON:   Is the jury able to see the

10   photograph?   No.   Okay.

11           MR. CARTER:   Exhibit --

12           MR. GIDEON:   All right.   I'm going to

13   respectfully move the admission of this photograph.   I'm

14   catching up, Judge.   I move the admission of this

15   photograph.

16           MR. JONES:   No objection.

17           THE COURT:   So ordered without objection.

18           MR. GIDEON:   Okay.   Now can I post it and

19   publish it to the jury?

20           THE COURT:   She is going to publish it to the

21   jury.

22           THE COURTROOM DEPUTY:   I got it.

23           MR. GIDEON:   Thank you.

24   BY MR. GIDEON:

25   Q.      All right.   This is the final photograph that

1  we've just admitted into evidence.  This is after you

2  have done everything that Mr. Jones talked to you about

3  using the HARMONIC® scalpel; correct?

4  A.        The longer one, yes.

5  Q.        The longer one.  After you have done everything

6  you intended to do with the HARMONIC® scalpel?

7  A.        Correct.

8  Q.        Okay.  And you were talking to the jury a few

9  minutes ago.  We're all familiar with laser cutting

10  tools.  We're familiar with saws and blades.  You

11  referred to this as performing its jobs through

12  ultrasonic function, and you talked about cutting and

13  sealing; correct?

14  A.        Correct.

15        MR. JONES:  Object to the leading.

16        MR. GIDEON:  Your Honor, under Rule 611, I

17  respectfully submit I'm permitted to do so.

18        THE COURT:  He is.  This is cross-examination,

19  Mr. Jones.  It might be his witness, but he is

20  cross-examining.  So I'm going to allow him to lead.  I

21  understand he's not adverse, but I'm going to allow him

22  to lead.

23        MR. GIDEON:  Yeah.

24  BY MR. GIDEON:

25  Q.        Tell us, please, about how an ultrasonic energy

1  device actually cuts and seals at the same time as

2  compared to cutting with a laser, cutting with a knife,

3  please.

4  A.       Well, obviously cutting with a knife is just --

5  it's blunt dissection.  It's the sharpness and there is

6  no sealing of any tissue.

7           The $CO_2$ laser is using just that.  It's

8  a -- it's a laser energy to cut and divide the tissue.

9  You do get some -- a little bit of coagulation with the

10  $CO_2$ laser.

11          With the staple, it's more of a -- I guess

12  physical stapling.  You still get some trauma to the

13  tissue as you're separating it; whereas, the ultrasonic,

14  the Harmonic® device, you're using vibration and energy.

15          So the bottom prong of that is an insulating

16  tip.  The top one is the one that vibrates.  And it goes

17  between those little jaws and it vibrates the tissue,

18  and as it's vibrating, it actually seals and cuts the

19  tissue at the same time.

20          The higher energy level will divide it faster.

21  The lower energy level will divide it more slowly.

22  There is actually built into that device what we call

23  adaptive tissue technology.  So it actually senses the

24  tissue and may divide it more rapidly and more slowly

25  based upon the features of the device itself.

1    So you could divide tissue one time on a

2  minimum setting and it may take three seconds to divide

3  it and seal it.  Another time it may take five seconds

4  to divide it, just based upon the technology and the

5  device itself.

6        MR. GIDEON:  I'd like to pass this to the

7  witness to authenticate this as a representative

8  duplicate of the handset that he used on January 12,

9  2018, and ask that it be admitted.

10        THE COURT:  Okay.  Any objection, Mr. Jones?

11        MR. JONES:  No objection.

12        THE COURT:  All right.  So ordered without

13  objection.  We're going to substitute a photograph of

14  that in our record.

15        MR. GIDEON:  After the case is concluded, Your

16  Honor, but I want the jurors to have the

17  three-dimensional model when they deliberate.

18  BY MR. GIDEON:

19  Q.      You mentioned adaptive technology.  That's the

20  first time it's been mentioned in this case.  Tell us

21  about the adaptive technology and the Johnson & Johnson

22  Ethicon HARMONIC® scalpel.  What does it do to assist in

23  accomplishing its goal and at the same time protecting

24  the patient?

25  A.      Well, just basically what I just described.  It

1  basically -- it senses the tissue in-between the prongs
2  and it divides it based upon the tissue characteristics
3  of the technology that's built into the machine.
4          You know, just -- you know, so, I mean,
5  technically, I mean, you're putting tissue in here.
6  You're clamping down on it.  This is the minimum and
7  maximum settings we talked about.  So you know where the
8  buttons are.
9          And the device we use in thyroid surgery in
10 head and neck, it's a little different, but it still has
11 the same positioning of the minimum and maximum
12 buttonings.  You know, you have a rotative device.
13 Obviously, technically, depending on where you're at,
14 you want to position differently depending on where the
15 closest tissue damage is.
16         Most people are going to have the insulated tip
17 down and a vibrating tip up in the esophageal airways.
18 So this one is going into the pocket itself and you're
19 closing it.
20         And, like I said, the device itself dictates
21 how fast it goes through the tissue to some degree.
22 Q.      Okay.  Back to the photograph that should still
23 be up, this is after you've used the HARMONIC® scalpel.
24 All the cutting, burning, energy source is finished;
25 right?

1  A.      Correct.

2  Q.      This is the photograph.  Does this photograph

3  show a hole in Ms. Foster's throat that's going to lead

4  to a perforation?

5  A.      No.

6  Q.      To a reasonable degree of medical certainty,

7  did you comply with standard of care in, A, looking at

8  this and putting the Bougie down to probe it?

9  A.      I don't know if it's standard for the

10 procedure, but it's what I do to ensure that there is no

11 hole there, to feel more confident when I'm done that

12 there is no physical hole there.

13 Q.      Okay.  Do you believe you complied with

14 standards of care in January of 2018, in the greater Oak

15 Ridge community, Knoxville community, by taking the

16 photograph, first of all, looking at it, and touching

17 the area with the Bougie to make sure there is no leak?

18 A.      Yes, certainly taking photographs is probably

19 beyond the standard of care because I don't know

20 of -- at least of my partners that take a lot of

21 photographs like I do.

22         But certainly to do the best possible care you

23 can for the patient, I think it's critical to feel those

24 areas and make sure you have no hole there before you

25 take your instruments out and wake the patient up.

1  Q.        All right.  You and I are both wearing glasses.

2  Were you using something that was a little more precise

3  than wearing a set of glasses when you were doing this

4  procedure?

5  A.        Yeah.  So the image you're looking at is from

6  an endoscope.  In the last 15, 20 years, the power of

7  the endoscopes have become so powerful that your

8  visualization using endoscopes is actually even so much

9  better than the microscope, and that's why I use it.  So

10 much to the point that even ear surgery now is

11 transitioning over to endoscopic ear surgery as opposed

12 to using a microscope.

13        And so what you can't see on here is:  I've

14 gotten so close to the area that from this view, you

15 can't even really see much of my staple line.  So that's

16 how magnified we are in on this shot here.

17        What you can see at the very bottom of the V is

18 what looks like to be probably the muscle layer.  And

19 then on the left side of the image, you can see where

20 the tissue has been sealed and coagulated.

21        The picture shows it better on the left than

22 the right, but it's a similar image on the right.  It's

23 just not centered.

24 Q.        Okay.  Bottom line then is:  As we look at this

25 photograph, as we form a mental image of this

1  photograph, approximately what kind of magnification are

2  we looking at?

3  A.      Well, I can't say in terms of magnification.  I

4  don't know a technical term for that.  But, you know,

5  again, we're talking about the visual image on there.

6  If the remaining sac was approximately five -- five

7  millimeters, that area on the screen is about five

8  millimeters.

9  Q.      Okay.  And that area on the screen does not

10  show either a leak or signs to suggest a leak to come;

11  correct?

12  A.      Correct.

13  Q.      All right.  Now, Mr. Jones spent some time

14  talking to you about when you first were told that

15  Ms. Foster's neck was full when she had some crepitance

16  and when she had some difficulty with swallowing.

17  You'll recall that exchange?

18       Should the nurse in question have notified you

19  earlier than she did?

20  A.      I think so.

21       MR. JONES:  Your Honor, we object.

22       THE COURT:  What's your objection?

23       MR. JONES:  May we approach?

24       THE COURT:  All right.

25       (Whereupon a sidebar was had outside the

1       hearing of the jury as follows:)

2           MR. JONES:  If it's not for laying a foundation

3   for blame, then it's irrelevant as to whether she did.

4   He hasn't said he knows the standard of care for this

5   person.  And there is no foundation for it and there is

6   no relevance as to whether the nurse should have done

7   something.

8           MR. GIDEON:  Well, I respectfully disagree

9   because there was all this time spent on when the nurse

10  notified him, and I wanted to close the loop that she

11  should have notified him earlier when she made those

12  findings because he spent so much time on it.  I just

13  want to close the loop.

14          MR. JONES:  I spent time on it and --

15          THE COURT:  One talking at a time.

16          Were you finished?

17          MR. GIDEON:  No.  And I also wanted to ask him

18  if he had done that, would he have operated sooner,

19  would he have intervened sooner, because one of the

20  critiques is going to be that he shouldn't have done the

21  second surgery if it was more than 24 hours after the

22  completion of the first.

23          But I'm not asking have you charged them at

24  Methodist, if there is any responsibility for this.

25          MR. JONES:  The last thing is exactly the blame

1  shifting that the Tennessee courts say under our Medical

2  Malpractice Act you can't do.  It covers both causation

3  and it covers negligence.  If you say that somebody else

4  has partial cause in an event, that's blame shifting and

5  you can't do it.  And I've cited it in a brief on this

6  to the Court.

7          The second thing is the issue of how long this

8  infectious process had been going on is a huge factor in

9  when they should do it, when they finally do it, and we

10  say it was too late to do the aggressive closure because

11  of so many hours that had past.

12          So I have to establish when the signs and

13  symptoms were there, which is what I did.

14          MR. GIDEON:  But if it's too late and the

15  person who is supposed to tell you didn't tell you, then

16  that's part of the evidentiary mix.

17          As I told the Court, I will not argue, and I'm

18  not going to ask that there be a spot on the jury

19  verdict form.

20          THE COURT:  What is your question to him going

21  to be exactly?

22          MR. GIDEON:  What would you have done if they

23  had notified you that night that she has got this

24  crepitance in her neck and she is having a difficult

25  time swallowing?  That's what I would ask.

1    MR. JONES:  And he's laying the foundation that

2    she -- I'm sorry, sir.

3    THE COURT:  Well, that's all you're going to

4    ask?

5    MR. GIDEON:  Yes, sir.

6    THE COURT:  We'll allow him to ask that

7    question.  I don't want you to go beyond that.

8    MR. GIDEON:  I told you I wouldn't.

9    THE COURT:  All right.

10    (Whereupon the following was had in open court

11    within the hearing of the jury:)

12    BY MR. GIDEON:

13    Q.    If you had gotten the call from the nurse that

14    night that Ms. Foster has got swelling into her neck and

15    had difficulty swallowing, whether 9:00 o'clock or 10:00

16    o'clock, whatever time it was, what would you have done?

17    A.    If we had gotten it at 9:00 o'clock -- well,

18    one, just air in the neck is not an emergency to go back

19    to the operating room right away.  So you still would

20    have conservative measures because a lot of the times

21    those air leaks can resolve on their own.  In fact, most

22    of the time they do.

23    So right then it wouldn't be an emergency that

24    needed to go back to surgery, but I would have moved her

25    to an ICU.  I would have put the feeding tube in, and I

CROSS-EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  would have waited to feed her again.

2  Q.      Okay.  Now, we've talked a little bit when

3  Mr. Jones was asking you questions about literature.

4  I'd like to ask you whether or not you consider the

5  publication entitled Flexible Endoscopic Management of

6  Zenker's Diverticulum, the Mayo Clinic Experience by

7  joint authors David Case and Todd Baron, do you consider

8  that reliable?

9  A.      Yes.

10       MR. GIDEON:  Okay.  I'm going to ask that those

11  be identified.  I'm aware of the rule that precludes

12  them from being exhibits.  And I'm going to do this

13  sequentially in just a moment, Your Honor.

14       THE COURT:  Any objection to the offered for

15  identification?

16       MR. JONES:  Not to marking it for

17  identification.

18       THE COURT:  All right.  So ordered.

19  BY MR. GIDEON:

20  Q.      The next one, there is another article entitled

21  Endoscopic Stapling of Zenker's Diverticulum:

22  Establishing National Baselines for Auditing Clinical

23  Outcomes in the United Kingdom.

24       Are you familiar with that article, too?

25  A.      Yes, I am.

CROSS-EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  Q.       Is that publication reliable?

2  A.       Yes.

3  Q.       Next publication entitled Zenker's

4  Diverticulum, Exploring Treatment Options from the

5  Otorhinological Society of Italy published in 2013.  Is

6  that publication also reliable?

7  A.       Yes.

8  Q.       Do those all three have one thing in common?

9  A.       Yes, they all note that perioperative

10  antibiotics are not required for an endoscopic

11  diverticulum.

12          MR. GIDEON:  May I approach and just have these

13  marked for identification purposes, please?

14          THE COURT:  Collectively as an exhibit?

15          MR. GIDEON:  Yes, sir.

16          THE COURT:  For identification, collective

17  exhibit?

18          MR. GIDEON:  Yes, sir.

19          THE COURT:  Thank you.

20  BY MR. GIDEON:

21  Q.       If you thought antibiotics were required by the

22  standard of care, would it have cost you anything to

23  write an order for two grams of Ancef IV for Ms. Foster

24  before the surgery?

25  A.       No.

1  Q.      If you had thought that she needed Clindamycin

2  or some other antibiotic preoperative, would it have

3  cost you anything, taken any significant time?

4  A.      No.

5  Q.      In your opinion, was it entirely appropriate

6  meeting the standard of care not to order intravenous

7  antibiotics for this lady who had been on amoxicillin,

8  thousand milligrams a day for several days?

9  A.      It was not indicated.

10  Q.      Just not indicated?

11         Did you comply with the standard of care or did

12  you blow it in your management of this lady?

13  A.      No, I complied with the standard of care.

14  Q.      Okay.  Did you treat her any differently in

15  terms of performing the Zenker's diverticulum than you

16  were trained at the Mayo Clinic?

17  A.      No.

18  Q.      Now, Mr. Jones asked you how many cases you had

19  done, residency and postgraduate, and asked you if you

20  had done anything since then.

21         Other than Ms. Foster's case, had you ever had

22  another perforation?

23  A.      No.

24  Q.      I want to get to the term "friable".  If we

25  have a Zenker's diverticulum that's formed over a number

 1  of years and that tissue pouches out, thins out as it's

 2  stretched and stretched and stretched, does the

 3  character of that tissue change from the way it was

 4  70 years ago, as Mr. Jones said?

 5  A.       Yes, slowly over time, it will.

 6  Q.       Okay.  What do you mean when you use the term

 7  "friable"?  Are you only referring to infected, grossly

 8  infected tissue?

 9  A.       No, what I mean by friable, it's easily torn.

10  Q.       Okay.  Is the pouch still friable even if not

11  infected?

12  A.       Yes.

13  Q.       Is that what you were trying to communicate

14  with your commentary with Mr. Jones?

15  A.       Yes.

16  Q.       The Penrose drain, let's assume for a moment

17  that what was reported to you from the folks at VCU,

18  that the Penrose drain migrated into the esophagus, is

19  that an example of a misplaced Penrose drain?

20  A.       No.

21  Q.       Okay.  Can a Penrose drain migrate into the

22  esophagus even though everybody has done everything

23  correctly?

24  A.       Yes.

25  Q.       Where was the Penrose drain placed in the first

1  place?  They have seen the line behind the esophagus.

2  Where did you put the Penrose drain to drain fluid out

3  of the mediastinal space?

4  A.        The Penrose drain was placed in that

5  retropharyngeal space starting in the upper mediastinum.

6  The suction drain was placed a little bit deeper and it

7  came out through the neck and was sutured in place.  So

8  it was sitting right behind the esophagus, right behind

9  the anastomosis, which is that suture line where we

10 brought those muscles together.  It was sitting right

11 behind that.

12 Q.        Okay.  For the --

13           MR. GIDEON:  I will ask the Court with

14 indulgence to lead for just a moment so we can set the

15 time frames.

16 BY MR. GIDEON:

17 Q.        There was an esophagram done on January 22,

18 2018, another one done January 28th or 29th; correct?

19 A.        Correct.

20 Q.        There was a CT scan done on the evening of the

21 13th into the morning of the 14th; correct?

22 A.        Correct.

23 Q.        And another CT scan done at Methodist Hospital

24 while Ms. Foster was still a patient there?

25 A.        Correct.  The eating after we did the

1  esophogram, Dr. Langerman at Vanderbilt had recommended

2  doing it so there wasn't any contrast fluid still

3  sitting in the chest.

4  Q.      All right.  Two CT scans, two esophograms.  Did

5  any of those -- did the reports on any of those suggest

6  the Penrose drain had found its way into the esophagus?

7  A.      No.

8  Q.      None of them at Methodist Hospital ever

9  suggested that?

10  A.      None.

11  Q.      And with respect to interpretation of imaging

12  studies, at a hospital like Park West or Fort Sanders or

13  Methodist Hospital in Oak Ridge, after those studies are

14  done, does a radiologist, a physician with specialty

15  with training in that field look at the imaging study

16  and do a report?

17  A.      Yes, they do.

18  Q.      So it's not just you looking at the scan?

19  A.      No.

20  Q.      In any of those four studies, did the

21  radiologist even suggest the Penrose drain was, in fact,

22  in the esophagus?

23  A.      No.

24  Q.      Okay.  The last thing I want to address is your

25  communications with Dr. Langerman at Vanderbilt.

1    Will you explain again why you were contacting

2    him.

3    A.    Well, after we had gotten the esophogram which

4    showed the leak in the neck, I had asked Ms. Foster --

5    we talked about what we were going to do and the

6    different options we could do.  We talked about how

7    those leaks can slowly heal over time.

8         You know, I think it was my impression that,

9    you know, because she was caring for her husband, you

10   know, the whole reason we were doing the endoscopic

11   approach to begin with and why she had sought three ENTs

12   is because she didn't want to have a delayed recovery.

13   She had to take care of her husband.  And so she did not

14   want to just wait on it closing by a secondary

15   intention.  She wanted to do something that would try to

16   get her back to normal functioning faster and out of the

17   hospital.

18        And so we had talked about surgical approaches

19   to closing it again, reinforcing more tissue, and it was

20   at that time she expressed that if she wanted to have

21   that done, she wanted to go to Vanderbilt, and that's

22   when I contacted Dr. Langerman.

23   Q.    All right.  Did you have a series of

24   communications with Dr. Langerman?

25   A.    I did.

1    MR. GIDEON:  All right.  I'd like to introduce

2  and move their admission into evidence the

3  communications between our client and Dr. Langerman at

4  Vanderbilt.

5  BY MR. GIDEON:

6  Q.      Is this the first one (indicating)?

7          THE COURT:  Is there any objection, Mr. Jones?

8  BY THE WITNESS:

9  A.      It's probably not the first --

10         THE COURT:  Hold on.  Hold on.

11         THE WITNESS:  Oh, I'm sorry.

12         (A discussion was had off the record amongst

13          opposing counsel.)

14         MR. JONES:  No objection, Your Honor.

15         THE COURT:  No objection?

16         MR. JONES:  Yes.

17         MR. GIDEON:  This was addressed a week ago.

18         MR. CARTER:  Joint 23.

19         MR. GIDEON:  I want them in order, please.

20  BY MR. GIDEON:

21  Q.      And what I want to do is authenticate these so

22  that we, the jury and the judge, sees the sequence of

23  these communications.

24         Up on the one that's 12:33 p.m., can you tell

25  us -- and basically just read it to us, the

1  communications back and forth between you and

2  Dr. Langerman, please.

3  A.      Well, this is following a conversation I had

4  had with Dr. Langerman.

5  Q.      Okay.

6  A.      And, I spoke with Zenker's patient and family.

7  I discussed -- discussed with you earlier today, and

8  they would like to see you and plan a surgical repair as

9  opposed to a waiting approach.  CT of the neck, chest

10 was just finished, but nurse informed me that they did

11 it without contrast due to the patient reporting a

12 history of a rash.

13 Q.      Okay.  His response?

14 A.      Hi, Jonathan.  Absolutely.  Our transfer center

15 number is the following, 615-875-4000.  Please tell them

16 I am going to accept the transfer and provide patient

17 details.  They will then get in touch with me to

18 confirm.  I'm scrubbing in right now.  So I may be out

19 of touch for a bit.  Thank you for thinking of me.

20 Please send them with disks of all scans, also.  Thank

21 you.

22 Q.      And then did you respond at 6:24 p.m. the same

23 evening?

24 A.      Sure.  I spoke with the radiologist, and

25 despite no contrast, he didn't see a large collection of

1  fluid but a little tracking along the Penrose drain

2  along the mediastinum.

3  Q.      All right.  And did the communications continue

4  into the evening?

5  A.      Jonathan, thank you.  I actually had a note to

6  reach out to you, so I'm happy you did.  I've checked

7  with transfer center a few times.  Looks like some

8  discharges are pending and it should be soon.  Alex.

9  Q.      All right.  Next.

10  A.      She will be excited.  She is already planning

11  her first meal when she is okay to swallow.

12          And then on February 2nd, Just an FYI.

13  Patient's daughter wanted her transferred closer to home

14  in Richmond, Virginia.  So she was transferred to VCU,

15  Virginia Commonwealth University, yesterday.  I

16  appreciate all your help.  Jonathan Hafner.

17  Q.      Okay.  So beyond providing care with -- for her

18  on the night of the 13th, into the morning of the 14th,

19  and providing care thereafter, after Ms. Foster

20  expressed her interest in having something definitive

21  done, you communicated directly with Dr. Langerman;

22  correct?

23  A.      That's correct.

24  Q.      Attempted to get her a bed at Vanderbilt?

25  A.      Correct.

CROSS-EXAMINATION - JONATHAN WILLIAM HAFNER, M.D.

1  Q.      Because of the shooting in Kentucky, they

2  didn't have any beds?

3  A.      Correct.

4  Q.      You then contacted at least two folks in

5  Virginia to get her admitted to VCU?

6  A.      Correct.

7  Q.      Okay.  Now, I want to close by asking you just

8  two questions, please.

9          Are you familiar with accepted standards of

10 care for an ear, nose and throat physician practicing

11 your specialty in Oak Ridge or a similar community in

12 January of 2018?

13 A.      Yes.

14 Q.      Did you meet the standard of care?

15 A.      Yes.

16 Q.      Was there anything you did that caused an

17 injury to Ms. Foster that was due to malpractice?

18 A.      No.

19         MR. GIDEON:  Thank you.

20         THE COURT:  Thank you.

21         Any redirect, Mr. Jones?

22         MR. JONES:  Yes, sir.

23         THE COURT:  Just for planning purposes, how

24 much do you anticipate?

25         MR. JONES:  20 minutes.

1    THE COURT:  Please proceed.

2                    REDIRECT EXAMINATION

3    BY MR. JONES:

4    Q.     Doctor, after your surgeries, did Mrs. Foster

5    have stricturing that was not present before your

6    surgery?

7    A.     Did she have what?

8    Q.     Did she have strictures that were not present

9    before your surgery?

10   A.     She had previous strictures that were dilated

11   two previous times that we were aware of; one 15 years

12   ago and then one -- and I believe in Virginia -- in 2014

13   before she presented to Dr. Rayne.

14   Q.     Doctor, did she have strictures that were not

15   present before you did your surgeries?

16   A.     She did not.  Those had been dilated

17   previously.

18   Q.     No question about it?  There wasn't any

19   strictures?  Nothing had changed about previous

20   strictures; is that correct?

21   A.     That is correct.

22   Q.     Do you recall me asking you, Did she have any

23   stricturing of the esophagus that was not present before

24   your surgery, and what your answer was?

25   A.     I do not.

1  Q.      She had strictures before the surgery that had
2  been treated.  Same thing you had told me.  Question,
3  does she have more stricturing now?  Answer, She had a
4  stricture that was treated.  Her current condition I
5  can't answer at the deposition, but she had a stricture
6  between the time of my surgery and the deposition.

7         Where did that stricture come from?
8  A.      Well, the whole process of the -- so you have
9  to look at your patient's overall history.  So one of
10 the main theories behind why you get too much
11 constriction of that cricopharyngeal muscle is from
12 chronic reflux.  And so she had had a long history of
13 chronic reflux.  She even presented to me -- I don't
14 think she was even on reflux medications.  And so over
15 time, you get constrictors which she had dilated two
16 previous times.

17        There is always going to be some scar tissue
18 every time you dilate that, and the strictures come back
19 over time.

20        Yes, we did a surgery on her.  With any
21 surgery, you're going to have scarring.  We talk about,
22 you know, main risk of any surgery; pain, infection,
23 bleeding, scarring.  So you're always going to have some
24 scarring and you may develop another stricture.

25        So I can't determine whether any future

1  stricture was related to what I did or to anything that

2  had happened previously before that.

3          That there was a stricture sometime afterwards,

4  that was true because there was a physician at

5  Vanderbilt who dilated that stricture.

6  Q.      And what caused that stricture that was dilated

7  that did not exist before you did your surgery?

8  A.      Again, it could be reflux.  It could be my

9  surgery.  She had had prior strictures.  So she was

10  prone to getting more strictures, again, based upon her

11  reflux disease.

12          I'm not saying it couldn't have been the prior

13  surgery that we had done, but there is a lot of the

14  factors in there that by the nature of what she had are

15  going to lead to strictures, and she had had two prior

16  strictures.

17  Q.      Doctor, after reviewing her records, did you

18  conclude that she had any permanent injury from your

19  surgeries?

20  A.      No.

21  Q.      Are you telling us and telling this jury that

22  she has absolutely no injuries as a result of your

23  surgery?

24  A.      No.

25  Q.      Do you recall me asking you in your

1  deposition -- page 106, line 7 -- Does she have any

2  permanent injury from the surgery in your opinion from

3  reviewing her records?  Answer, Yes, we discussed the

4  stenosis.  We discussed the stenosis.

5          Did you give that testimony?

6  A.      Well, I just said that our surgery could have

7  caused a stenosis.  Reflux can cause a stenosis.  But

8  can I say 100 percent that her stricture down the line

9  was from the surgery?  I can't say that 100 percent.  It

10  could be.  I'm not denying that it couldn't be.

11  Q.     And did you say basically that that --

12          THE COURT:  Is there an objection?

13          MR. GIDEON:  Yes, there is Federal Rule 106,

14  Rule of Completeness.  I think the rest of --

15          MR. JONES:  I'm getting ready to do that.

16  That's what I'm --

17          MR. GIDEON:  Let me just note my objection to

18  the Court.

19          Rule of Completeness, Rule 106.  The rest of

20  page 106 needs to be read at the same time, not just the

21  lines that were just read, all the way down to at least

22  line 21.

23          MR. JONES:  Your Honor, that's exactly what I

24  was getting ready to do.

25          THE COURT:  Okay.  So, objection sustained.

1    You're going to read it in.

2              MR. JONES:  Okay.

3              THE COURT:  All right.  Thank you.

4    BY MR. JONES:

5    Q.      And I asked you how does that affect her.  Then

6    you say, Well, I guess, I should correct that's not

7    permanent, but it affected her in that she had had it

8    dilated.  But it was not worse because it showed up even

9    before it had been dilated.  That was the tablet in the

10   esophagus that was passing easily into her esophagus.

11   So functionally, before she even had the stenosis

12   dilated, she had improved function of her esophagus

13   prior to my -- compared to before my surgery and

14   afterwards.

15           Question, How long will the dilation reduce the

16   stricture before it comes back?  I can't answer that.

17           Do you expect it to come back?  Do you expect

18   it to come back?

19   A.      Are you reading a statement or asking me a

20   question?

21   Q.      I'm asking you a question now.  Are you

22   expecting that stricture to come back?

23   A.      Like I just said, it very well could.

24   Q.      Was this stricture greater after you did your

25   surgery?  Was it different after you did your surgery?

1  A.        Well, there was -- immediately before our

2  surgery, there was not a stricture.  The concept you

3  have to get is strictures develop over time.  So if you

4  get a static image at one time and say there is no

5  stricture, she has the process of developing strictures

6  over time because of her chronic reflux.

7          So even if we had done a surgery that didn't

8  require us to go back to the second surgery, she was

9  still at risk of developing strictures over time because

10 of her reflux.

11 Q.        Sir, with her stricture, was it different after

12 your surgery?

13 A.        Yes.

14 Q.        While she was hospitalized after her repair

15 surgery, did she -- did she have leaks from two

16 different places in her esophagus?

17 A.        After the -- can you repeat the question?

18 Q.        After the repair surgery, did she have leaking

19 in two locations in her esophagus or from her esophagus?

20 A.        The swallow studies show that it was tracking

21 in different places.

22 Q.        From two places?

23 A.        It was tracking two different places.

24 Q.        So does that mean she had two leaks?

25 A.        Well, there is -- I can't answer that question

 1  because I can't see.  The only information you have is
 2  from the swallow study.  So when they do the swallow
 3  study and it tracks to different places, it could be one
 4  hole and the contrast is tracking into different sides
 5  of the neck.
 6          We had already done a surgery that, you know,
 7  went into that potential space, and so it's going to
 8  track differently.  So the contrast tracks to the right
 9  and tracks to the left.  It could be coming through the
10  same hole; it could be coming from two different holes.
11  There is just no way of knowing that information from
12  the esophogram.  I don't think it obviously delineated
13  that.  It just said where the contrast is tracking to.
14  Q.      Did you ever track to see after your surgery if
15  there were two holes in her esophagus?
16  A.      After the second surgery?
17  Q.      After the second surgery.
18  A.      Well, you know, we can't go back and look
19  unless you open up the neck again to see, and she had
20  already decided if she wanted another procedure that
21  that was going to be done at Vanderbilt.  So we just
22  wouldn't have that information.
23  Q.      Doctor, where we saw on photograph A that
24  brownish tissue, that's where you had applied the
25  HARMONIC® scalpel; is that correct?

1  A.      That brownish tissue at the bottom I already

2  described before was the bottom of the cricopharyngeal

3  muscle at the tip of the Harmonic®.

4  Q.      And that was exactly where the hole was in your

5  second surgery; is that correct?

6  A.      That is not correct.

7          MR. JONES:  Okay.

8          THE COURT:  Are you finished, Mr. Jones?

9          MR. JONES:  Yes, Your Honor.

10         THE COURT:  Any recross?

11         MR. GIDEON:  One question.

12                    RECROSS-EXAMINATION

13  BY MR. GIDEON:

14  Q.      Would perioperative IV antibiotics for

15  60 minutes around the time of the surgery have

16  sterilized or prevented mediastinus -- mediastinitis and

17  avoided the need for that second surgical procedure?

18  A.      No.

19         MR. GIDEON:  Thank you.

20         THE COURT:  Thank you.

21         Are we finished with this witness?

22         MR. GIDEON:  Yes.

23         MR. JONES:  Just very brief.

24         THE COURT:  We've had our direct.  We've had

25  our cross.  We've had our redirect.  We've had our

1   recross.

2        MR. JONES:  We had an entirely new subject that

3   last time.

4        THE COURT:  Okay.  I'll let you go ahead.

5   You've got one question?

6        MR. JONES:  No, sir.  I'll wait and do it with

7   another witness because I'll need more development than

8   that.

9        THE COURT:  All right.  Are we finished with

10  this witness?

11       MR. GIDEON:  Yes, sir.

12       THE COURT:  All right.  Thank you.

13       All right.  Thank you, Doctor.

14       (Witness excused.)

15       (Whereupon a portion of the trial proceedings

16        was had but not requested to be transcribed.)

17

18

19

20

21

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T-E

2     STATE OF TENNESSEE

3     COUNTY OF KNOX

4              I, Teresa S. Grandchamp, RMR, CRR, do hereby

5     certify that I reported in machine shorthand the above

6     excerpt report proceedings, that the said witness(es)

7     was/were duly sworn; that the foregoing pages were

8     transcribed under my personal supervision and constitute

9     a true and accurate record of the proceedings.

10             I further certify that I am not an attorney or

11    counsel of any of the parties, nor an employee or

12    relative of any attorney or counsel connected with the

13    action, nor financially interested in the action.

14             Transcript completed and signed on March 30,

15    2022.

16

17

18

19


21             _____
                TERESA S. GRANDCHAMP, RMR, CRR
22              Official Court Reporter

23

24

25